FILED

1  Randall R. Lee (SBN: 152672)
   randall.lee@wilmerhale.com
2  P. Patty Li (SBN: 266937)
   patty.li@wilmerhale.com
3  Emily S. Churg (SBN 261334)
   emily.churg@wilmerhale.com
4  WILMER CUTLER PICKERING
        HALE AND DORR LLP
5  350 South Grand Avenue, Suite 2100
   Los Angeles, CA 90071
6  Telephone: (213) 443-5300
   Facsimile: (213) 443-5400
7
8  Attorneys for Defendant HSBC BANK USA, N.A.

2010 NOV 16  PM 2: 39

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY :_____

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11  HUA NAN COMMERCIAL BANK, a          Case No.  CV 10  8773-VBF
    foreign corporation; HUA NAN                              (MANx)
12  INVESTMENT TRUST
    CORPORATION, a foreign corporation;
13  COSMOS BANK, a foreign corporation;   **NOTICE OF REMOVAL**
    ENTIE COMMERCIAL BANK, a
14  foreign corporation; BANK SINOPAC, a
    foreign corporation; TAICHUNG
15  COMMERCIAL BANK, a foreign
    corporation,
16
17              Plaintiffs,
18         vs.
19  HSBC BANK USA, N.A., a national
    bank association; DAILY & KNUDSON
20  LAW GROUP, LLP, a Nevada limited
    liability partnership; JAMES DAILY, an
21  individual; WILLIAM H. KNUDSON,
    an individual; ANTHONY BUFINSKY,
22  an individual; and DOES 1-10,
23              Defendants.
24
25
26
27
28

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071

Pursuant to 12 U.S.C. § 632, Defendant HSBC Bank USA, N.A. ("HSBC")
removes the above-captioned civil action, formerly pending in the Superior Court of
the State of California, County of Los Angeles, No. BC447478, to this Court.  As
grounds for removal, HSBC states the following:

## Basis For Removal

1.     HSBC is a national banking association, incorporated under the laws of
the United States.  (*See* Exhibit A ("Compl.") ¶ 8.)

2.     12 U.S.C. § 632 provides that the district courts of the United States have
original jurisdiction over all civil suits involving corporations organized under the
laws of the United States (such as HSBC) when those suits "aris[e] out of transactions
involving international or foreign banking, . . . or out of other international or foreign
financial operations . . . ."

3.     12 U.S.C. § 632 further provides that "any defendant in any such suit
may, at any time before the trial thereof, remove such suits from a State court into the
district court of the United States for the proper district by following the procedure for
the removal of causes otherwise provided by law."

4.     The instant action, originally filed in the Superior Court of California,
County of Los Angeles, on October 15, 2010 (and served on HSBC on October 18,
2010), is a suit "of a civil nature at common law or in equity" that arises out of
transactions involving "international or foreign banking" or "other international or
foreign financial operations."  The Complaint is attached as Exhibit A.

5.     This action was initiated by a group of six foreign financial institution
plaintiffs, all of which are organized under the laws of the Republic of China (Taiwan)
– Hua Nan Commercial Bank Ltd., Hua Nan Investment Trust Corporation, Cosmos
Bank, EnTie Commercial Bank, Bank SinoPac, and Taichung Commercial Bank
(collectively, "Plaintiffs").  (*See* Compl. ¶ 7.)

6.     Plaintiffs allege that they lost money in a fraudulent scheme led by an
individual named Danny Pang and carried out through a company called PEM Group,

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071

1    a Nevada corporation formerly headquartered in Irvine, California. (*Id.* ¶ 1.)

2    Plaintiffs' alleged causes of action against HSBC arise from Plaintiffs' purchases of

3    "securities" (*id.* ¶ 23), including debentures, collateralized debt obligations and notes

4    (*id.*, Ex. 7), from entities incorporated in the British Virgin Islands (the "GVEC

5    entities") (*id.* ¶ 22). A Taiwanese subsidiary of PEM Group allegedly served as

6    "Advisor" to the GVEC entities. (*Id.* ¶ 22.)

7        7.    Plaintiffs allege that certain securities offerings by the GVEC entities

8    were insured by an Italian insurance company (*id.* ¶ 41), and by a European re-

9    insurance company (*id.* ¶ 46).

10        8.    Plaintiffs allege that HSBC served as a "cash" and "asset" custodian for

11    the GVEC entities, keeping custody of the investor proceeds from the GVEC offerings

12    and certain of the assets acquired thereto. (*Id.* ¶¶ 34-38.)

13        9.    Plaintiffs allege that in this capacity, HSBC performed numerous banking

14    functions for these foreign entities, including (without limitation) executing wire

15    transfers into and out of the GVEC entities' accounts. (*Id.* ¶ 36.) Among the wire

16    transfers alleged by Plaintiffs are a wire transfer to the Italian insurance company (*id.*

17    ¶ 42), wire transfers used to acquire shares in a Chinese company (*id.* ¶ 95a), wire

18    transfers to "PEM Group affiliates that invested in Chinese investments" (*id.* ¶ 102g),

19    and wire transfers used to acquire undeveloped land in Costa Rica (*id.* ¶ 102h).

20        10.    Plaintiffs also allege that "HSBC maintains a substantial presence in

21    Asia," and that "HSBC is well known in Taiwan, among institutional investors, banks,

22    and the general public." (*Id.* ¶ 52.) Plaintiffs allege that HSBC's status as "a major

23    international bank with a substantial presence in Asia" led them to trust place their

24    trust in HSBC. (*Id.* ¶¶ 52, 59.)

25        11.    Accordingly, this Court has jurisdiction over this matter pursuant to 12

26    U.S.C. § 632, and this matter may be removed to this Court.

27

28

NOTICE OF REMOVAL

**Compliance With Procedural Requirements**

12.     This Notice of Removal was filed prior to trial and thus is timely under 12 U.S.C. § 632.

13.     Removal to this District is proper pursuant to 12 U.S.C. § 632 (and consistent with 28 U.S.C. § 1441(a)) because the U.S. District Court for the Central District of California, Western Division, embraces the place where the state court action was formerly pending.

14.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings and orders served upon HSBC in the state court action are attached hereto.

15.     Pursuant to 28 U.S.C. § 1446(d), HSBC has served this Notice of Removal on Plaintiffs and has filed a Notice of Filing of Notice of Removal with the Superior Court of the State of California, County of Los Angeles.

WHEREFORE, Defendant HSBC prays that this action be removed to this Court.

Respectfully submitted,

Dated: November 16, 2010

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: _____

Randall R. Lee
P. Patty Li
Emily S. Churg
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Defendant*
*HSBC BANK USA, N.A.*

NOTICE OF REMOVAL

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 350 South Grand Avenue, Suite 2100, Los Angeles, California 90071.

On November 16 , 2010, I served the foregoing document(s) described as:

**NOTICE OF REMOVAL**

on each interested party, as stated on the attached service list.

☒  I personally caused to be hand delivered the document(s) listed above to the person(s) and the address(es) set forth below:

R. Alexander Pilmer
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
*Counsel for Plaintiffs*

Michael A. Taitelman
Freedman & Taitelman, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067
*Counsel for Defendant Anthony Bufinsky*

Arthur H. Barens
Barens Law Building
10209 Santa Monica Blvd.
Los Angeles, CA 90067
*Counsel for Defendants James Daily, Daily & Knudson Law Group LLP, William H. Knudson*

☐  I placed the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, CA, addressed as set forth below.

☐  I electronically filed the document(s) listed above via the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 16, 2010, at Los Angeles, California.

_____
Cynthia Thomas

PROOF OF SERVICE

# EXHIBIT A

1  R. Alexander Pilmer (Bar No. 166196)
2  Christopher T. Casamassima (Bar No. 211280)
   Sasha Danna (Bar No. 244462)
3  Nien-Ping Wang (Bar No. 261295)
   Jay Bhimani (Bar No. 267689)
4  **KIRKLAND & ELLIS LLP**
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone: (213) 680-8400
6  Facsimile: (213) 680-8500

7

8  Attorneys for Plaintiffs

9

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

OCT 15 2010

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Shaunya Wesley

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

10  HUA NAN COMMERCIAL BANK, a foreign     )  CASE NO.   **BC 4 4 7 4 7 8**
    corporation; HUA NAN INVESTMENT TRUST  )
11  CORPORATION, a foreign corporation; COSMOS )  **COMPLAINT FOR:  (1) FRAUD; (2)**
    BANK, a foreign corporation; ENTIE       )  **NEGLIGENT MISREPRESENTATION;**
12  COMMERCIAL BANK, a foreign corporation;  )  **(3) AIDING AND ABETTING FRAUD;**
    BANK SINOPAC, a foreign corporation;     )  **(4) AIDING AND ABETTING BREACH**
13  TAICHUNG COMMERCIAL BANK, a foreign      )  **OF FIDUCIARY DUTY;**
    corporation,                            )  **(5) CONSPIRACY TO COMMIT**
14                                          )  **FRAUD AND BREACH OF**
                                            )  **FIDUCIARY DUTY; (6) BREACH OF**
15          Plaintiffs,                     )  **FIDUCIARY DUTY; AND**
                                            )  **(7) NEGLIGENCE**
16      vs.                                 )
                                            )
17  HSBC BANK USA, N.A., a national bank     )  **DEMAND FOR JURY TRIAL**
    association; DAILY & KNUDSON LAW GROUP,  )
18  LLP, a Nevada limited liability partnership; JAMES )
    DAILY, an individual; WILLIAM H. KNUDSON, )
19  an individual; ANTHONY BUFINSKY, an      )
    individual; and DOES 1-10               )
20                                          )
                                            )
21          Defendants.                     )
                                            )
22

23

24

25

26

27

28

CITY/CASE: BC447478 LEA/DEF#:
RECEIPT #: CCH46590015
DATE PAID: 10/15/10 08:42:23 AM
PAYMENT: $355.00
RECEIVED:
CHECK:
CASH:
CHANGE:
CARD:       355.00
0310

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................3

THE PARTIES, JURISDICTION AND VENUE ........................................................5

FACTUAL ALLEGATIONS ......................................................................................6

A.   An Overview Of The Life Settlement Industry, The PEM Group Fraud Scheme, And Defendants' Role In That Fraud. ..............................................6

B.   The Fraud At Its Infancy:  Shortly After Its Formation, PEM Group Conducts Its First 17 Offerings. ............................................................8

C.   PEM Group's Offering Memoranda Promise Investors Various Protections.....................9

D.   Merrill Lynch Fires PEM Group, So PEM Group Turns To HSBC.................10

E.   PEM Group Fails To Obtain Promised Protections But, With HSBC's Assistance, Continues To Mislead Investors. ..............................................12

F.   HSBC Becomes A Direct Participant In PEM Group's Fraud When Investors, Including Plaintiffs, Rely On The Misrepresentations Made In Its "To Whom It May Concern" Letter...........................................................15

G.   The Fraudulent Nature Of HSBC's "To Whom It May Concern" Reference Letter.........21
  1.   Misrepresentation No. 1—Overstating The Length Of HSBC's Relationship With PEM Group. ............................................................22
  2.   Misrepresentation No. 2—Stating That PEM Group Was In Compliance With Prior CPOMs; In Fact, PEM Group Had Failed To Acquire Required Assurance, And Had Misused Investors' Funds. ................................23

H.   HSBC Also Makes Fraudulent Misrepresentations To Investors In Net Asset Value Reports. ............................................................24
  1.   Plaintiffs SinoPac And Taichung Received And Relied On Fraudulent Net Asset Value Reports From HSBC...........................................24
  2.   The Net Asset Value Reports Contained Material Misrepresentations. ..............25
  3.   Fraudulent Circumstances Surrounding Net Asset Value Reports Sent To Plaintiff SinoPac. ............................................................27
  4.   Fraudulent Circumstances Surrounding The Net Asset Value Reports Sent To Plaintiff Taichung. ............................................................30

I.   HSBC Gives Additional Substantial Assistance To PEM Group In Its Fund-Raising Efforts. ............................................................33

J.   HSBC's Motivation For Developing Its Symbiotic Special Relationship With PEM Group:  Money...........................................................34

1

K.      Government Findings Of HSBC's Failures That Led To Illegal Activity..........................35

L.      D&K, Through Its Principals Mr. Daily And Mr. Knudson, Approves Transactions It Knows Violate Representations Made In Offering Memoranda And That Result In The Loss Of Investor Funds..............................................................................................36

CAUSES OF ACTION ......................................................................................................39

PRAYER FOR RELIEF ....................................................................................................46

JURY TRIAL DEMAND ..................................................................................................46

2

**INTRODUCTION**

1.      Plaintiffs are Taiwanese banks who were swindled out of hundreds of millions of dollars. The fraudulent scheme was led by Danny Pang, who orchestrated a massive fraud through a company called PEM Group. Pang's fraud was facilitated by the active fraud, conspiracy, and aiding and abetting of HSBC Bank USA, N.A. ("HSBC"), Anthony Bufinsky (a former HSBC executive who became an executive at PEM Group), and Daily & Knudson Law Group (a law firm that served as trustees in connection with the fraudulent investment projects).

2.      HSBC aided PEM Group's fund-raising activities by affirmatively lying to investors about the length of time that HSBC had serviced PEM Group's investments, and by falsely representing that investments in PEM Group's prior offerings "have been and continue to function in conformity with the confidential private offering memoranda by which the respective financial projects are governed including institution of performance assurance for assets." (*See* Exhibit 1). The truth is, however, that the so-called "performance assurance" was not provided by an A-rated insurance company as promised. Instead, when the Plaintiffs were making their decisions to invest with PEM Group, the "assurance" for many of the financial projects referenced by HSBC was provided by "Albatross Invest, S.p.A.," an Italian company that itself was a fraud. Nor were PEM Group's other operations "in conformity with" the applicable standards. PEM Group routinely misused investor funds to fund Mr. Pang's lavish lifestyle and PEM Group's exorbitant operating expenses—including the purchase of private jets and taking the entire company on a Disney cruise. The funds used to pay for these blatantly inappropriate expenditures of investors' money were often taken from HSBC custodial accounts, with the consent of HSBC.

3.      Why did HSBC lie to investors on behalf of PEM Group and facilitate PEM Group's fraud? Put simply:  money. HSBC and PEM Group's close relationship allowed Mr. Bufinsky, a former HSBC executive who later worked for PEM Group, to "whore myself out for a friend!" (*see* Exhibit 2), so that "more cash should be coming [HSBC's] way soon for the offerings!" (*See* Exhibit 3.) Further, as Mr. Bufinsky bluntly explained to his friend, an HSBC Vice-President, Robert Radich:  "Bob today I will be sending over a letter to you for your review which will state that PEMG has had a relationship for x amount of years with HSBC. This is a comfort letter for Fubon

3

and the $150 mil that coming to you.  I will be sending similar letters to Erwin & Johnson and Stone field our auditors.  If you can review and send on your letterhead and sign, I will surely lick Francesca's box for you and suffer through the pain for more PF deals your way!"[1]  (*See* Exhibit 4.) Even though Mr. Bufinsky's draft letter was not true, Mr. Radich placed it on HSBC letterhead, signed it, and permitted PEM Group to send it out to potential investors—including Plaintiffs here— to solicit additional investments.  It is no wonder that, in March 2007, Mr. Bufinsky called Mr. Radich the "king of Client Service!"  (*See* Exhibit 5.)

    4.    In fact, facilitating fraud was part of HSBC's corporate culture.  Just recently, the United States Department of the Treasury, Office of the Comptroller of the Currency, issued a cease and desist consent order (*available at* http://www.occ.treas.gov/ftp/release/2010-121a.pdf) finding, among other things, that HSBC's "compliance program and its implementation are ineffective," that HSBC had "not appropriately designated customers as 'high-risk,'" and that it had been ineffective at implementing "internal controls for customer due diligence, procedures for monitoring suspicious activity, and independent testing."  Here, HSBC not only failed to monitor suspicious activity but, to bolster its own profits, affirmatively sought to further PEM Group's scam.

    5.    Daily & Knudson Law Group, LLP ("D&K"), James Daily, and William H. Knudson (collectively, the "D&K Defendants"), also aided PEM Group's fraud.  D&K, which held in trust the funds raised by PEM Group from investors, had a fiduciary duty to act in the interests of investors, and to ensure that their money was being invested as promised.  But the D&K Defendants repeatedly approved improper and undisclosed transfers of investor funds (including funds raised from Plaintiffs) from HSBC custodial accounts to accounts controlled by Mr. Pang and PEM Group, so that PEM Group could make high-risk and undisclosed investments in, among other things, undeveloped land in Costa Rica and Chinese coal mines.

    6.    The damage to the Plaintiffs on account of Defendants' fraudulent conduct exceeds $500 million.

---

[1]  Mr. Bufinsky's e-mail correspondence frequently contains misspellings and grammar errors. Plaintiffs repeat his words verbatim and without correction.

# THE PARTIES, JURISDICTION AND VENUE

7.    Plaintiffs Hua Nan Commercial Bank Ltd. ("Hua Nan Commercial Bank") and Hua Nan Investment Trust Corporation ("Hua Nan Investment Trust") (collectively, "Hua Nan"), Cosmos Bank ("Cosmos"), EnTie Commercial Bank ("EnTie"), Bank SinoPac ("SinoPac"), and Taichung Commercial Bank ("TCB") are all corporations organized under the laws of the Republic of China (Taiwan).  Hua Nan Commercial Bank and SinoPac also have branch offices in the County of Los Angeles, State of California.

8.    Defendant HSBC Bank USA, N.A. ("HSBC") is a national banking association with its main office in Virginia.  HSBC has over 475 bank branches throughout the United States and is a member of the FDIC.  It is a subsidiary of HSBC North America Holdings, Inc., one of the ten largest banking holding companies in the United States.  This Court has jurisdiction over HSBC because it maintains multiple branch offices in California, including throughout the County of Los Angeles, personally availing itself of the protections and benefits of the laws of this state.

9.    Defendant Daily & Knudson Law Group, LLP ("D&K") is a limited liability partnership organized under the laws of the State of Nevada with its principal place of business in Irvine, California.  On information and belief, Plaintiffs allege that there are two partners in D&K: James Daily and William H. Knudson.  This Court has jurisdiction over D&K because it does business in this state, personally availing itself of the protections and benefits of the laws of this state.

10.    Defendant James Daily ("Daily") is an attorney admitted to practice in the State of California, a partner in D&K, and, on information and belief, a resident of the State of California.

11.    Defendant William H. Knudson ("Knudson") is an attorney admitted to practice in the State of Nevada, but not admitted to practice in the State of California.  According to the State Bar of Nevada's records, he identifies his office as being located at Daily & Knudson Law Group, LLP, in Irvine, California.  On information and belief, Plaintiffs allege that Mr. Knudson is a resident of the State of California.

12.     Mr. Daily and Mr. Knudson are personally liable under, among other statutes, California Corporations Code Section 16306(e) and Sections 606 through 609 of the Nevada Uniform Limited Partnership Act.

13.     Defendant Anthony Bufinsky ("Bufinsky") is an individual who, on information and belief, resides and operates a financial services business in the State of California, County of Orange.

## FACTUAL ALLEGATIONS

A.      **An Overview Of The Life Settlement Industry, The PEM Group Fraud Scheme, And Defendants' Role In That Fraud.**

14.     Danny Pang founded Private Equity Management Group, Inc. and Private Equity Management Group, LLC (collectively, "PEM Group") in 2002.  PEM Group was primarily involved in the life settlement industry.  In general, companies in the life settlement industry purchase life insurance policies from individual insureds and, upon the insureds' death, collect the policies' proceeds.  The sooner people die, the faster the business recoups its investment.  If people live longer than expected, the business loses money.  In addition to life settlement investments, PEM Group also purported to invest in, among other things, time-share vacation properties.

15.     PEM Group represented to investors that their investments would be safer than ordinary life settlement investments because it promised to acquire "performance assurance" to protect against downside risk.  In one typical offering, for example, PEM Group represented that it would acquire performance assurance in the form of insurance policies or similar commitments from institutions rated "A" or better by Moody's, S&P, or Fitch that would—according to PEM Group— pay investors the full amount of their principal investment as well as promised returns if the life settlement investments underperformed.  A copy of the offering memorandum given to investors for this offering, dated February 6,.2004, is attached as Exhibit 6.

16.     HSBC played a critical role in the fraudulent scheme.  HSBC eventually served as cash custodian for nearly every PEM Group offering.  Recognizing that the more money it was holding as custodian, the more fees it would receive, HSBC actively helped to recruit additional investors for PEM Group.  HSBC even provided PEM Group with solicitation letters addressed "To Whom It May Concern," stating that various PEM Group offerings functioned in conformity with

6

representations made by PEM Group, including PEM Group's representations that it would acquire "performance assurance" from "A" rated financial institutions. (*See* Exhibit 1.) These representations were false, and HSBC knew them to be false. (*See* ¶¶ 68–80.)

17.     HSBC also assisted PEM Group in trying to obtain the appearance of "performance assurance" by allowing Mr. Bufinsky to write false letters to potential insurers, which HSBC executives then signed on HSBC letterhead and sent back to Mr. Bufinsky for him to forward to the insurance companies. HSBC did this knowing that PEM Group wanted the appearance of performance assurance to be able to market its investments as safe to potential investors.

18.     In addition, acting in its capacity as custodian, HSBC regularly sent investors, including several Plaintiffs, reports purportedly representing the net value of the assets supporting their investments. But these reports grossly overstated the actual value of the assets, and of the investors' accrued interest in the applicable offerings because, for one thing, PEM Group never acquired the promised assets. Instead, investor funds were used to, among other things: purchase private jet planes, provide millions of dollars in excessive compensation, acquire high-risk and undisclosed investments (such as the purchase of Costa Rican land, and a stake in a Chinese coal mine), and pay lavish operating expenses (including a three-day cruise aboard a Disney cruise ship attended by all PEM Group employees). Much of the money that went to pay for these things was wired out of HSBC accounts to various noncustodial accounts, including accounts controlled by Mr. Pang. In addition, HSBC did not attempt to value any of the assets PEM Group did actually acquire before issuing reports attesting to the net value of those assets.

19.     The D&K Defendants were also vital to the PEM Group scheme. D&K served as trustee for many of the offerings in which Plaintiffs invested. As trustees, they owed Plaintiffs fiduciary duties to ensure Plaintiffs' money was invested as PEM Group represented. Instead, the D&K Defendants repeatedly approved transactions in violation of the applicable offering memoranda. For example, they approved, and HSBC executed, transfers in excess of $39 million to various entities—including entities they knew were controlled by Mr. Pang—that PEM Group used to misappropriate funds or acquire interests in high-risk and undisclosed investments.

20.     Plaintiffs were unaware of the PEM Group fraud until the Wall Street Journal published an exposé about the fraud in April 2009. Shortly thereafter, the United States Securities and Exchange Commission filed a civil fraud suit in Federal Court, which appointed a receiver to take possession of, and manage the assets of, PEM Group and Mr. Pang. Before this time, the fraud was actively concealed by the actions of PEM Group, its executives, and the conduct of the Defendants' alleged herein. On September 12, 2009, Mr. Pang was taken by paramedics from his Newport Beach home to Hoag Hospital, where he died. The Orange County coroner has ruled his death to be a suicide.

21.     As a result of PEM Group's collapse, and the Defendants' actions, PEM Group's investors were left holding the bag, including more than $500 million in losses suffered by Plaintiffs.

**B.     The Fraud At Its Infancy: Shortly After Its Formation, PEM Group Conducts Its First 17 Offerings.**

22.     Throughout its existence, PEM Group established so-called "Special Purpose Vehicles" ("SPVs") incorporated in the British Virgin Islands. PEM Group controlled these SPVs at all relevant times. Equity Resources Management Ltd. ("ERML")—a PEM Group subsidiary located in Taiwan—served as the "Advisor" to each SPV and purportedly provided "consulting services."

23.     From late 2003 through mid-2006, PEM Group conducted several offerings through two SPVs called Genesis Voyager Equity Corporation ("GVEC") and GVEC Resources, Inc. ("GVECR"). Because the GVEC offerings were PEM Group's first set of offerings, they were referred to internally at PEM Group as the "Pioneer Funds." Together, GVEC and GVECR conducted 17 securities offerings and raised approximately $158 million from investors, including Plaintiff SinoPac and multiple individual investors.

24.     The GVEC offerings, conducted in six tranches from late 2003 and continuing through mid-2005, raised over $125 million. The GVECR offerings, conducted in 11 tranches from early to mid-2006, raised approximately $29 million. The dates of each GVEC and GVECR offering, as well as the dates of all other offerings conducted by PEM Group, the amounts invested

8

1    by Plaintiffs, and the amount due Plaintiffs in connection with their investments, are identified in the

2    table attached as Exhibit 7.

3    **C.      PEM Group's Offering Memoranda Promise Investors Various Protections.**

4        25.     In connection with each offering, PEM Group provided investors with a "Confidential

5    Preliminary Private Offering Memorandum" or "Confidential Private Offering Memorandum"

6    (collectively, "CPOM") that, among other things, specified how the investors' money would be used

7    and how their money would be protected.

8        26.     The CPOMs for the GVEC offerings promised investors that their funds would be

9    pooled and used to purchase "Special Value Assets" and "Added Value Assets." The CPOMs

10   represented that the "Special Value Assets" would be protected by performance assurance in the

11   form of an insurance policy (or similar commitment, such as a bond) from a financial institution

12   rated at least "A-" or "A" or better by Moody's or a similar S&P or Fitch rating. If the Special

13   Assets underperformed, the CPOMs represented that this insurance policy or similar commitment

14   would pay investors the full amount of their principal investment as well as the promised annual

15   returns—usually 6% to 7%. For example, the CPOM for the GVEC Preferred Shares A offering

16   (dated February 6, 2004), attached as Exhibit 6, included these representations:

17       The Company will use approximately 60%–80% of its capital raised from the sale of
         the Shares to acquire financial assets of a proprietary nature backed by investment
18       grade institutions (the "Special Assets") [and] *to assure performance of the Special
         Assets through commitments by an independent third-party institution rated A or*
19       *better by Moody's, S&P or Fitch* (the "Assurer")[.]

20       The Company will use approximately 60%–80% of the amount invested in the
         Company at each Closing to purchase the Special Assets . . . and . . . *to obtain*
21       *commitments to assure (the "Minimum Proceeds Assurance"),* so that the Special
         Assets will provide proceeds to the Company over its seven year term *at least equal*
22       *to the total amount of capital invested* in the Company at that Closing (i.e. the
         Principal Amount multiplied by the number of Shares issued in a Closing) *plus a 6%*
23       *simple annual return from 21 February 2004 (the "Minimum Proceeds").*

24       The Company will secure, from the Assurer, *performance assurance, rated A or*
         *better by Moody's, S&P or Fitch* or obtain Alternative Commitments (defined below)
25       along similar terms and credit rating by Moody's, S&P or Fitch, to commit to the
         Company that, at time certain and no later than at the end of the seven year term, the
26       Assurer will liquidate the existing Special Assets to cash, so that the Company will
         have cash equal to the Minimum Proceeds.
27
         The Company reserves the right, in the sole discretion of the Manager, in lieu of
28       obtaining insurance through the Assurer with respect to any Closing, instead, to

obtain **commitments with comparable terms from one or more third persons (in the form of bonds, insurance policies or surety bonds, financial guarantees, GIC's or similar instruments from an issuer from at least investment grade A- or better from Moody's or a similar grade from S&P or Fitch)** or secured by cash in an amount sufficient to fully secure the commitment in an institution with the same investment grade rating or better under Moody's, S&P or Fitch (the "Alternative Commitments"). These Alternative Commitments will be purchased so that the Company will be able to satisfy the Minimum Proceeds and such Alternative Commitments will be the Minimum Proceeds Assurance.

(emphasis added).

27.     The CPOMs for the GVECR offerings also promised performance assurance, in the form of so-called "performance guarantee bond[s]" purportedly backed by financial institutions rated "A" or better. For example, the CPOM for the GVECR Series A-1 offering, dated November 15, 2005, and attached as Exhibit 8, represented that:

Payment of 100% of the interest through the Maturity Date and the principal are assured through . . . a performance guarantee bond securing the principal and interest less Prepaid Interest . . . reinsured through two intermediary reinsurers to one or a combination of Swiss Re or Munich Re or other entities in the London market with a reinsurance rating of not less than "A."

28.     This performance assurance was supposed to provide a critical protection for the investors' investment and promised returns. It assured investors that, if upon maturity the investments had failed to generate a sufficient return, then a highly-rated financial institution would pay investors their principal investment as well as the roughly 6% to 7% annual returns promised by the CPOMs.

**D.     Merrill Lynch Fires PEM Group, So PEM Group Turns To HSBC.**

29.     PEM Group also represented to investors that banks would serve as custodians with respect to the funds raised from investors in connection with the various offerings.

30.     The CPOMs for GVEC Preferred Shares A (dated as of February 6, 2004) and GVEC Notes A (dated as of April 28, 2004) indicated that Merrill Lynch would "act as the custodian of the Special Assets and the Added Value Assets" and would also "receive the subscription moneys for Shares and the money required to satisfy redemption of Shares and any distributions to be paid in respect of the Shares." Thus, Merrill Lynch served as both "asset" and "cash" custodian for these two GVEC offerings. Todd Gillespie worked for Merrill Lynch, and was Merrill Lynch's primary

10

point of contact with PEM Group when the GVEC Preferred Shares A and GVEC Notes A offerings took place.

31.     By early 2005, Merrill Lynch refused to continue serving as asset and cash custodian for the GVEC Preferred Shares A and GVEC Notes A tranches. In fact, it refused to serve as a custodian for any additional PEM Group SPV. Merrill Lynch took additional steps to disassociate itself from PEM Group, including terminating the personal banking accounts of Mr. Pang and Nasar Aboubakare (another senior PEM Group executive). Shortly thereafter, Mr. Gillespie left Merrill Lynch, and began working at PEM Group as a Managing Director.

32.     To replace Merrill Lynch as cash custodian, PEM Group met with other banks, including Bank of America and Wells Fargo. These banks, however, declined to do business with PEM Group after learning of PEM Group's business model and practices.

33.     After being turned down by Merrill Lynch, Bank of America, and Wells Fargo, Mr. Pang turned to an old contact of his, Mr. Bufinsky, who was a Vice President of HSBC. Although Mr. Bufinsky was not in HSBC's Corporate Trust & Loan Agency department—the department that would normally provide custodial services—he introduced PEM Group executives to Robert Radich and others at HSBC. At the time, Mr. Radich was a Vice President of HSBC's Corporate Trust & Loan Agency department. Mr. Bufinsky and Mr. Radich regularly partied together in New York to, as they called it, "rip it up" or "tear it up."

34.     HSBC began serving as custodian for all, or at least all but one, of the GVEC and GVECR tranches in early 2005, including the GVEC Preferred Shares A and GVEC Notes A tranches for which Merrill had refused to continue serving as custodian.

35.     HSBC served as both "cash" and "asset" custodian for the GVEC and GVECR offerings.

36.     As "cash" custodian for the GVEC and GVECR offerings, HSBC held all of the investor funds raised by those offerings and, among other things, was responsible for making transfers into and out of the GVEC and GVECR accounts (including those containing investor funds) at the direction of PEM Group or a trustee of the funds designated in the applicable CPOMs.

11

37.     As "asset" custodian for the GVEC and GVECR offerings, HSBC's responsibilities included holding the assets acquired by the applicable PEM Group SPV with investor funds. More specifically, as asset custodian for the GVEC offerings, HSBC's responsibilities included holding the Special Value Assets and the so-called "performance assurance" from highly-rated financial institutions that the CPOMs represented would guarantee investors certain promised annual returns and the repayment of principal investment.

38.     In addition to the GVEC and GVECR offerings, HSBC served as asset and cash custodian for all offerings by the SPV named GVECR IV, and as cash custodian for all other offerings by PEM Group SPVs, including offerings by GVEC II and GVECR II and III.

39.     On one occasion, as HSBC accepted its duties as custodian for an offering by GVECR II, Mr. Bufinsky (who, by this time, had begun working for PEM Group after being recruited by Mr. Pang) told Mr. Radich: "I'm at life exchange in Miami right now, bro I'm gonna take this to the next level! Your coming for the ride." Mr. Radich replied, "awesome[.]" A copy of this e-mail chain is attached as Exhibit 9. Indeed, HSBC did go along for the ride, and was paid at least $1,874,000 in fees for providing custodial services for PEM Group's offerings, in which Plaintiffs lost a total of over $500 million. (*See* Exhibit 7.)

**E.    PEM Group Fails To Obtain Promised Protections But, With HSBC's Assistance, Continues To Mislead Investors.**

40.     From the outset, PEM Group's GVEC and GVECR offerings failed to comply with the representations made in CPOMs. Among other things, the performance assurance promised in the CPOMs for these offerings never existed.

41.     In connection with the GVEC offerings, with scores of legitimate insurers rated "A" or better to choose from, Mr. Pang and Mr. Aboubakare chose instead to select an Italian insurance company called Albatross Invest S.p.A. ("Albatross"). Albatross was not rated "A" or better; indeed, it had no rating it all. It was a fraud; had reputed ties to organized crime syndicates in Italy; and, among other things, was the "go to" insurer for fraud schemes in the life settlement industry. But PEM Group acquired bogus insurance policies from Albatross for each GVEC offering and, in the process, caused GVEC to pay Albatross substantial amounts of investor funds. And PEM Group

knew of problems at Albatross, but continued to deal with Albatross anyway, in part because Albatross paid Mr. Pang and Mr. Aboubakare substantial amounts of cash as "kick-backs."

42.    For its part, HSBC knew that PEM Group had acquired policies from Albatross, instead of policies from a legitimate and highly-rated financial institution. Indeed, HSBC's responsibilities included holding the Albatross policies in GVEC custodial accounts. HSBC was also tasked with executing wire transfers between GVEC and Albatross. On May 9, 2005, for example, PEM Group's Chief Financial Officer e-mailed Wendy Zhang at HSBC with an "urgent" request that she "confirm via email that the . . . instruction to wire 1.68 million to Albatross have been executed." Ms. Zhang confirmed the transfer soon thereafter. PEM Group's CFO replied: "Thanks Wendy. You Rock!" A copy of this e-mail chain is attached as Exhibit 10.

43.    Similarly, with respect to the GVECR offerings, PEM Group never acquired the performance guarantee bonds backed by "A" rated financial institutions that were promised in CPOMs.

44.    Nor did PEM Group acquire the performance assurance promised in CPOMs for any offerings conducted after the initial offerings by GVEC and GVECR. For example, Plaintiffs invested in various offerings by SPVs called GVEC II and GVECR II and III. (*See* Exhibit 7.) By the time these offerings were conducted, PEM Group had established captive insurance companies that were owned and controlled by PEM Group executives, including Mr. Aboubakare. The first of these captive insurance companies, Fides Insurance Company, Ltd. ("Fides") was established by PEM Group on or about December 19, 2006. Soon thereafter, PEM Group established Irvine Insurance Company (BVI) ("Irvine Insurance").

45.    In connection with most, if not all, offerings by GVEC II and GVECR II and III (in which Plaintiffs invested approximately $500 million), PEM Group insured all or a portion of potential loss through Fides or Irvine Insurance. It represented to investors, however, that these Fides or Irvine Insurance policies would be reinsured through "A" rated reinsurance institutions. The CPOM for the GVECR II Debentures Series 2007 B (dated July 2, 2007, and attached as Exhibit 11), represented, for example, that "Payment of 100% principal and 5.85% interest will be assured pursuant to an insurance or reinsurance issued by HCC re, or a member of the Talanx Group AG,

13

1   whose general unsecured obligations are rated not less than 'A.'"  Plaintiffs Hua Nan Commercial

2   Bank and Cosmos invested approximately $20 million in the GVECR II Debentures Series 2007 B

3   offering in reliance on this promised reinsurance.  (*See* Exhibit 7.)

4        46.    But, despite these representations, PEM Group never obtained adequate reinsurance.

5   PEM Group recognized, however, that some measure of reinsurance—no matter how grossly

6   inadequate it was in reality—was needed to give the appearance of the kind of assurance from "A"

7   rated institutions promised to investors in CPOMs.  On one occasion, for example, PEM Group

8   representatives forged a reinsurance policy for $108 million from HCC Re.  The forged policy was

9   then presented to Plaintiff SinoPac and other investors to solicit additional investments.  On other

10  occasions, to dupe investors, PEM Group acquired some reinsurance from various entities, including

11  Euro International Reinsurance SA ("Euro Re"), a European-based reinsurance company.

12  Unbeknownst to the Plaintiffs, and despite PEM Group's representations, the coverage amounts of

13  these policies were far too small to offer any meaningful protection.

14       47.    HSBC was instrumental in PEM Group securing this inadequate reinsurance, which

15  PEM Group used to swindle investors.  To that end, on April 20, 2007, Mr. Bufinsky e-mailed Mr.

16  Radich, asking Mr. Radich to sign a draft letter addressed to Mr. D. Stenzel, who was identified as a

17  managing director at Euro Re.  The draft letter stated that "I can confirm that HSBC Bank USA,

18  National Association has an existing relationship with the following entities," with the GVEC II,

19  GVECR, GVECR II, GVECR III, and GVECR IV explicitly referenced.  The draft letter went on to

20  say that: "The relationship has been in place for 4 years and they are clients in good standing with

21  the bank.  All of our relationships and funds associated with the offerings are subject to periodic

22  review."

23       48.    Mr. Bufinsky did not hear back from Mr. Radich.  So, that afternoon, he e-mailed

24  Frank Godino, another Vice President of HSBC in New York, saying "Frankie, I don't think bob is

25  in today.  I had him draft me a letter yesterday and need it modified only to list out our issuing

26  entities.  Can you in his place use the below language and pdf me a copy on letterhead?"  Mr.

27  Godino replied:  "Ant, Can I ask Andy or Gloria to do this or will it cause a lot of questions?  Radich

28  was here, but I think he left early."  Mr. Bufinsky encouraged Mr. Godino to sign the letter

14

1   immediately: "If you do it, it will get done today!  Bob approved [sic] it, I just needed the entities

2   listed out."  Moments later, Mr. Godino returned the signed letter, with the exact language Mr.

3   Bufinsky had drafted, and told Mr. Bufinsky: "Do me a favor.  Please don't use this as an example

4   for future letters.  I don't want Andy [Andres Serrano, another Vice-President at HSBC] knowing I

5   signed it."  A copy of this e-mail thread is attached as Exhibit 12, and Mr. Godino's signed letter to

6   Euro Re is attached as Exhibit 13.

7       49.     PEM Group then used the letter Mr. Godino had signed to acquire a policy from Euro

8   Re for only a small fraction of the amount of the investments.  PEM Group used the existence of this

9   reinsurance coverage during in-person "road show" presentations made to Plaintiffs by PEM Group

10  executives.

11      50.     During a presentation on or about July 2–3, 2007 in Taipei, for example, PEM Group

12  repeatedly referenced the Euro Re reinsurance policies in pitching investments in offerings by

13  GVEC II to Plaintiff SinoPac.  Relying on these presentations, and in part on the purported

14  reinsurance provided by Euro Re, SinoPac invested approximately $87 million in two offerings by

15  GVEC II:  the GVEC II Series 2006 offering (CPOM dated August 1, 2006), and the GVEC II

16  Debentures Series 2006-A offering (CPOM dated October 10, 2006).  (*See* Exhibit 7.)  This

17  deception would not have been possible without the aid and cooperation of HSBC.

18      51.     This was not an isolated incident.  As described *infra*, HSBC routinely helped PEM

19  Group solicit additional investors to keep the fraud going.  For HSBC, more investors for PEM

20  Group meant more custodial fees, and more referrals of lucrative business to raise HSBC's bottom

21  line, all at the expense of Plaintiffs.

22  **F.    HSBC Becomes A Direct Participant In PEM Group's Fraud When Investors,**

23  **Including Plaintiffs, Rely On The Misrepresentations Made In Its "To Whom It May**

24  **Concern" Letter.**

25      52.     HSBC's representations were important to Plaintiffs.  Along with its affiliates, HSBC

26  maintains a substantial presence in Asia:  the origins of the bank were in Hong Kong and Shanghai,

27  where branches first opened in 1865; HSBC's affiliates remain the largest bank in Hong Kong, and

28  the largest international bank in China; and a quarter of it and its subsidiaries' combined assets are

15

located in Asia.  Indeed, HSBC is well known in Taiwan, among institutional investors, banks and the general public.

53.     In the fall of 2006, representatives of PEM Group in Taiwan approached Plaintiff Hua Nan Investment Trust about investing in a series of new PEM Group offerings by an SPV called GVECR II.  The offerings were called GVECR II Series 2006 A1 through A5.  At this time, PEM Group's representatives provided Hua Nan Investment Trust with various written materials, including CPOMs for the various offerings and HSBC's "To Whom It May Concern" reference letter, which is attached as Exhibit 1.  This letter contained several representations of fact, including representations that HSBC had served as custodian for PEM Group products for over three years, and that 17 prior offerings were in conformity with their CPOMs.  (For more details regarding Exhibit 1, *see* ¶¶ 68–80.)

54.     Before committing to this investment, Hua Nan Investment Trust sought and obtained necessary internal approvals.  In December 2006, in reliance on the materials PEM Group's representatives provided, including HSBC's "To Whom It May Concern" letter, Hua Nan Investment Trust agreed to invest in these offerings.  It invested $5,000,000 in each of the GVECR II Series 2006 A1 through A4 offerings, and $2,450,000 in the GVECR II Series 2006 A5 offering, for a total investment of $22,460,000.  Later, and in continued reliance on HSBC's misrepresentations— including misrepresentations in the "To Whom It May Concern" reference letter—Hua Nan Investment Trust invested $30,616,225 in another series of offerings by GVECR II, called the GVECR II Series 2008 A1 through A5 offerings.  Hua Nan Investment Trust, in other words, made the following investments in PEM Group offerings in reliance on HSBC's "To Whom It May Concern" reference letter:

| Offering | CPOM Dated | Amount Invested |
| --- | --- | --- |
| GVECR II - 2006 A-1 | 12/1/2006 | $5,000,000 |
| GVECR II - 2006 A-2 | 12/1/2006 | $5,000,000 |
| GVECR II - 2006 A-3 | 12/1/2006 | $5,000,000 |
| GVECR II - 2006 A-4 | 12/1/2006 | $5,000,000 |

16

| GVECR II - 2006 A-5 | 12/1/2006 | $2,460,000 |
|---|---|---|
| GVECR II - 2008 A-1 | 1/2/2008 | $6,000,000 |
| GVECR II - 2008 A-2 | 1/2/2008 | $6,000,000 |
| GVECR II - 2008 A-3 | 1/2/2008 | $6,000,000 |
| GVECR II - 2008 A-4 | 1/2/2008 | $6,000,000 |
| GVECR II - 2008 A-5 | 1/2/2008 | $6,616,225 |
| Total | | $53,076,225 |

55.    After Hua Nan Investment Trust's investment in GVECR II Series 2006 A1 through A5, its sister company, Plaintiff Hua Nan Commercial Bank, also agreed to invest in various PEM Group offerings.   Before committing to these investments, Hua Nan Commercial Bank, like Hua Nan Investment Trust, sought and obtained necessary internal approvals.  The same personnel who, in reliance on HSBC's "To Whom It May Concern" reference letter, approved Hua Nan Investment Trust's investment also approved Hua Nan Commercial Bank's investment.  In April and May 2007, Hua Nan Commercial Bank, through its branches in Los Angeles and New York, even contacted HSBC (as well as D&K) directly to verify HSBC's role in the offerings.  In continued reliance on HSBC's "To Whom It May Concern" letter, Hua Nan Commercial Bank made the following investments in PEM Group offerings:

| Offering | CPOM Dated | Amount Invested |
|---|---|---|
| GVECR II - 2007 A | 4/30/2007 | $12,560,000 |
| GVECR II - 2007 B | 7/2/2007 | $8,160,000 |
| GVECR II - 2007 C | 9/3/2007 | $86,660,000 |
| GVECR II - 2007 E | 11/26/2007 | $54,240,000 |
| GVECR II - 2008 B | 1/15/2008 | $45,170,000 |
| GVECR II - 2008 C | 1/14/2008 | $11,570,000 |
| Total | | $215,360,000 |

17

56.     PEM Group representatives similarly provided Cosmos Bank with HSBC's "To Whom It May Concern" letter.  Cosmos received the "To Whom It May Concern" letter in late-2006 to early-2007.  In reliance on that letter, Cosmos Bank made the following investments in PEM Group offerings:

| Offering | CPOM Dated | Amount Invested |
|----------|-----------|-----------------|
| GVECR II - 2007 B | 7/2/2007 | $14,030,000 |
| GVECR II - 2007 C | 9/3/2007 | $15,860,000 |
| GVECR II - 2007 D | 11/1/2007 | $7,290,000 |
| GVECR II - 2007 E | 11/26/2007 | $2,110,000 |
| GVECR II - 2008 C | 1/14/2008 | $330,000 |
| GVECR III - 2007 A-4 | 4/2/2007 | $9,300,000 |
| Total |  | $48,920,000 |

57.     After Hua Nan, Cosmos, and SinoPac had made various investments, EnTie followed suit and made the following investments in PEM Group offerings:

| Offering | CPOM Dated | Amount Invested |
|----------|-----------|-----------------|
| GVECR II - 2007 C | 9/3/2007 | $13,320,000 |
| GVECR II - 2007 D | 11/1/2007 | $8,260,000 |
| GVECR II - 2008 E | 3/31/2008 | $15,229,000 |
| GVECR II - 2008 G | 5/1/2008 | $8,546,000 |
| GVECR III - 2007 A-4 | 4/2/2007 | $7,570,000 |
| Total |  | $52,925,000 |

58.     Similarly, after Hua Nan, Cosmos, SinoPac and EnTie had made various investments, Taichung Bank made the following investments in PEM Group offerings:

| Offering | CPOM Dated | Amount Invested |
|----------|-----------|-----------------|
| GVECR II - 2008 E | 3/31/2008 | $18,112,000 |

18

| GVECR II - 2008 G | 5/1/2008 | $10,314,000 |
| GVECR II - 2008 H-6 | 6/21/2008 | $12,380,000 |
| GVECR II - 2008 I | 6/1/2008 | $14,533,000 |
| GVECR II - 2008 J | 8/4/2008 | $15,621,000 |
| <u>Total</u> | | $70,960,000 |

59.     When the investments were pitched to them, Plaintiffs were largely unfamiliar with PEM Group, PEM Group's SPVs, and with Mr. Pang and other PEM Group executives. But they knew and trusted HSBC, a major international bank with a substantial presence in Asia. Therefore, they placed unique and reasonable emphasis on HSBC's representations that HSBC had done business with PEM Group for an extended period of time, and that all offerings and operations conformed with representations made in offering memoranda.

60.     In early May 2007, for example, Hua Nan Commercial Bank asked PEM Group to provide verification that HSBC recognized and had reviewed the CPOMs issued by PEM Group in connection with the GVECR II Debentures Series 2007 A offering (CPOM dated April 30, 2007). On May 9, 2007, Mr. Bufinsky (who had been working for PEM Group for over a year by this time) e-mailed Mr. Radich, saying "Hey Bob, Hua Nan is being a bit of a pain in the fact that they would like to know HSBC is recognizing the CPOM which it is a part of as listed Custodian. If they don't get some sort of confirmation from our banking relationship which is now a legal requirement in Taiwan, they may not be able to move on investment which is $200mm in total. I modified the letter I sent you yesterday and ask if you have any ideas if we can massage this to just reference the CPOM, I don't care even if it its listed as a Subject header if that makes sense, any ideas buddy?" A copy of this e-mail, including the draft letter authored by Mr. Bufinsky, is attached as Exhibit 14.

61.     Later that afternoon, Mr. Radich e-mailed Mr. Bufinsky, telling him to "Please provide a rationale for the confirm letter to Andy [Andres Serrano, Vice President at HSBC in New York]. Doing my best[.]" Mr. Bufinsky replied that: "The reason for the confirm letter is for Taiwan Regulation, and now what is customarily for local banks in the region, is to confirm that the Custodian Banks are recognizing their acknowledgement and their role in the CPOM. Since HBUS

19

1    [upon information and belief, an HSBC subsidiary operating in the United States] is stated in the

2    Offering Documents, Hua Nan and all of the others will want to know that the bank has reviewed the

3    documentation and has no further comments."

4        62.    In reply, Mr. Radich told Mr. Bufinsky, "Thanks Bet you can imagibe [sic] my

5    torture," to which Mr. Bufinsky wrote: "Thanks buddy, yes I can imagine!  I would really appreciate

6    it, if he [Mr. Serrano] wont sign I would be perfectly happy with asking Kevin [Kevin Fisher, at the

7    time Mr. Radich and Mr. Serrano's supervisor at HSBC in New York] for an exception, this is now

8    mandatory for all of Taiwan regulated banks and Trust companies to make confirmation.  Anything

9    you can do would be ideal, we can just add the sentence in the letter Andy sent that state that HBUS

10   recognizes the CPOM dated Apr 30th."

11       63.    Minutes later, Mr. Radich e-mailed Mr. Bufinsky to tell him that "Mackay [Thomas

12   Mackay, Vice President of Corporate Trust Administration at HSBC in New York] is working with

13   it.  He's pretty reasonable[.]"  About 40 minutes later, Mr. Bufinsky e-mailed Mr. Radich again:

14   "Bob, sorry to be a pest, but do you think Mackay will have an answer today?" to which Mr. Radich

15   replied, "i hope so[.]"  Mr. Bufinsky replied "That would be ideal, hua nan is still here and it would

16   be great to give it to them before they leave."  A copy of this e-mail chain is attached as Exhibit 15.

17       64.    Mr. Serrano ultimately provided Mr. Bufinsky with the letter.  Mr. Bufinsky asked

18   Mr. Serrano to make minor revisions, noting that "I really appreciate the help with this one, it will

19   mean lots more business for us both."  Mr. Serrano replied, noting that it was "Not a problem."  A

20   copy of this e-mail chain is attached as Exhibit 16.

21       65.    Mr. Bufinsky then made additional minor revisions to the letter and asked Mr.

22   Serrano to sign, on HSBC letterhead.  Among other representations, the letter stated that HSBC

23   would serve as custodian "for the invested capital and assets acquired with the proceeds of the Notes

24   offering as provided in the CPOM."  Moreover, the letter stated that HSBC accepted "our related

25   duties as stated in the Custodian Agreement, which are also provided for under the CPOM."  A copy

26   of this letter is attached as Exhibit 17.

27       66.    On May 10, 2007, after Mr. Serrano sent the letter, Mr. Bufinsky e-mailed Mr.

28   Serrano, copying Mr. Mackay and Mr. Radich, stating: "Gents, I do want to Thank you all for the

quick turnaround to my request. I must commend the client service and attention we have received by Mr. Serrano and Mr. Radich as our relationship management team. I look forward to more closings, the next being May 18th with Hua Nan! Thank you all once again for your outstanding attention to PEMG." A copy of this e-mail chain is attached as Exhibit 18.

67.     Later that same day, at Mr. Radich's request, Mr. Bufinsky agreed to "steer a little money" to Mr. Radich's business acquaintance because, as Mr. Bufinsky put it: "Its me returning the favour buddy, you helped me bigtime so its only right to do the same back." A copy of this e-mail chain is attached as Exhibit 19.

**G.     The Fraudulent Nature Of HSBC's "To Whom It May Concern" Reference Letter.**

68.     By May 2006, Mr. Bufinsky had joined PEM Group to help in soliciting money from investors. In order to raise money, Mr. Bufinsky determined that some investors would require written representations from HSBC about HSBC's involvement in PEM Group's offerings.

69.     On May 23, 2006, Francesca Musto—an associate in HSBC's Project Finance department in New York—e-mailed Mr. Bufinsky, telling him that "it was great catching up with you last month at the Ex-Im conference. I hope everything is going well and if you are in the neighborhood, drop me a line, so we can go for coffee or lunch." Mr. Bufinsky forwarded the e-mail to Mr. Radich at HSBC, telling him "This is too easy! So how many project finance deals do you need this year? I'm willing to whore myself out for a friend!" A copy of this e-mail chain is attached as Exhibit 2.

70.     Minutes later, Mr. Bufinsky sent Mr. Radich another e-mail, attached as Exhibit 4, stating:

> Bob today I will be sending over a letter to you for your review which will state that PEMG has had a relationship for x amount of years with HSBC. This is a comfort letter for Fubon and $150 mil that coming to you. I will be sending similar letters to Erwin & Johnson and Stone field our auditors. If you can review and send on your letterhead and sign, I will surely lick Francesca's box for you and suffer through the pain for more PF deals your way!

71.     A little over an hour later, Mr. Bufinsky sent Mr. Radich a draft letter for his signature. Mr. Radich returned the letter, on HSBC letterhead, signed, and addressed "To Whom It May Concern," a little over 90 minutes after receiving Bufinsky's draft. A copy of HSBC's "To

21

Whom It May Concern" reference letter is attached as Exhibit 1. Mr. Bufinsky, upon receipt of Mr. Radich's signed letter, replied via e-mail that Mr. Radich was "the King of all Bones!" A copy of this e-mail is attached as Exhibit 20.

72.     HSBC's "To Whom It May Concern" letter made several misrepresentations.

### 1.     Misrepresentation No. 1—Overstating The Length Of HSBC's Relationship With PEM Group.

73.     HSBC's "To Whom It May Concern" letter represented, among other things, that HSBC "has provided custodial services to projects and transactions in which Equity Resource Management Ltd. ('ERML') has been involved for over three years" and that it "serves as Custodian for all seventeen of these current financial projects[.]" As alleged *supra* at ¶ 22, Equity Resource Management Ltd. is a PEM Group subsidiary located in Taiwan.

74.     This representation, identified in ¶ 73, was false, and HSBC knew it to be false. In fact, HSBC did not begin providing custodial services for any offerings until at least January or February 2005, approximately 18 months before HSBC's "To Whom It May Concern" reference letter. The custodian for the first PEM Group offering, GVEC Preferred Shares, was an entity called Bermuda Trust (Far East) Limited. And the custodian for the next two offerings—GVEC Preferred Shares A and GVEC Notes A—was Merrill Lynch. The CPOMs for these first three offerings are dated October 13, 2003, February 6, 2004 and April 28, 2004, respectively.

75.     The truth, of course, was more than simply that HSBC had its dates wrong. In fact, HSBC was not the original custodian on all 17 projects. Moreover, Merrill Lynch had been the custodian and then withdrew from the projects. HSBC's misrepresentations regarding the length of time it had severed as custodian, along with its concealment of the circumstances surrounding how it became the custodian, were both false and material. Had HSBC disclosed the truth about the extent of its prior relationship with PEM Group, and the circumstances surrounding Merrill Lynch's withdrawal, the Plaintiffs would not have invested in the PEM Group offerings.

22

2.  **Misrepresentation No. 2—Stating That PEM Group Was In Compliance With Prior CPOMs; In Fact, PEM Group Had Failed To Acquire Required Assurance, And Had Misused Investors' Funds.**

76.     HSBC's "To Whom It May Concern" reference letter also represented that: "The seventeen current financial projects in which HSBC provides custodial services and ERML serves as Advisor have been formed, offerings have been conducted and operations *have been and continue to function in conformance* with the confidential offering private offering memoranda by which the respective financial projects are governing *including institution of performance assurance for assets.*" (Exhibit 1 (emphasis added).)  The first seventeen offerings by GVEC and GVECR are the "seventeen current financial projects" referenced.  (*See* Exhibits 1, 7.)

77.     This representation, identified in ¶ 76, was false, and HSBC knew it to be false. Among other things, the CPOMs for the applicable offerings promised performance assurance in the form of insurance policies or similar commitments backed by highly-rated financial institutions. But, as described *supra* at ¶¶ 40–51, this promised performance assurance never existed, and HSBC knew it did not exist.  This misrepresentation was material.  Performance assurance provided a critical protection, assuring investors that, whatever the performance of the life-insurance policies held by PEM Group's SPVs, a highly-rated financial institution would be obligated to pay investors at least the returns promised in CPOMs as well as their principal investment.  If Plaintiffs knew that such assurance did not exist, they would not have invested with PEM Group.

78.     In addition, when Plaintiffs received HSBC's reference letter, PEM Group had begun transferring funds raised from investors in later offerings to pay returns promised to investors of earlier offerings—including the 17 offerings referenced in HSBC's letter.  PEM Group had also begun spending investor funds on lavish, and unauthorized, expenses.  HSBC knew of these transfers because it executed each of them in its capacity as cash custodian of the relevant offerings.

79.     For example, by late 2006, life settlement investments held in the GVEC Preferred Shares A tranche had been sold to the GVEC Preferred Shares D1 tranche.  And similar sales had been made from the GVEC Preferred Shares, Preferred Shares A, Notes A, and Preferred Shares B1 tranches to the GVECR IV Notes A tranche.  The sales were made at a premium to cost.  In other

words, PEM Group caused later tranches, like GVECR IV Notes A, to misuse investor funds to over-pay for assets held by earlier tranches, like the GVEC tranches. GVEC would then use the proceeds from that inter-tranche sale to pay investors. This was the only way PEM Group could pay GVEC investors at all. By late 2006, GVEC's life settlement investments were underperforming because, contrary to PEM Group's actuarial tables, insureds were living longer than expected.

80.     HSBC knew about these "inter-tranche" transfers because it executed the wire transfers PEM Group used to effectuate them. It also knew that these transfers were unauthorized and violated the applicable CPOMs, which represented to investors that returns would be paid from acquired assets—which investors were told would be largely life settlement investments—not the funds of later investors. Had HSBC given Plaintiffs accurate information, they would have known that PEM Group had been paying earlier investors' returns with money raised from later investors. And, had Plaintiffs been given this information, they would not have invested with PEM Group.

**H.     HSBC Also Makes Fraudulent Misrepresentations To Investors In Net Asset Value Reports.**

**1.     Plaintiffs SinoPac And Taichung Received And Relied On Fraudulent Net Asset Value Reports From HSBC.**

81.     Certain PEM Group investors received periodic "Net Asset Value" ("NAV") reports issued on HSBC letterhead. These reports purported to represent the current value of an investor's share in a given offering. The reports were not only on HSBC letterhead, many were signed by HSBC officials, including Nelson Kercado, an HSBC Vice-President. A representative example of an HSBC NAV report is attached as Exhibit 21.

82.     In February 2004, Plaintiff SinoPac invested millions of dollars in a PEM Group offering by GVEC called GVEC Preferred Shares A. HSBC regularly provided SinoPac with NAV reports with respect to that investment. In fact, HSBC's representations regarding the value of SinoPac's investment were false, and instead HSBC's NAV reports substantially overstated the value of SinoPac's investments. (For more details demonstrating the fraudulent nature of the NAV reports, *see* ¶¶ 91–105.)

83.    SinoPac, however, was unaware of the fraudulent nature of HSBC's NAV reports. The reports provided SinoPac with comfort that its investments were in good hands with PEM Group and HSBC.  In reliance on these fraudulent NAV reports for its initial investment, SinoPac made the following investments in PEM Group offerings:

| Offering | CPOM Dated | Amount Invested |
|---|---|---|
| GVEC PS D1 | 6/15/2005 | $60,000,000 |
| GVEC II - Series 2006 | 8/1/2006 | $32,000,000 |
| GVEC II - Series 2006-A | 10/10/2006 | $55,000,000 |
| Total | | $147,000,000 |

84.    Before making these investments, representatives from SinoPac—including the First Vice President of SinoPac's Corporate Financial Services Group—traveled to PEM Group's offices in California and met with, among others, Robert Gatti, an HSBC representative from New York.

85.    SinoPac continued to receive NAV reports in connection with these additional investments.  It received NAV reports in connection with its investment in the GVEC II Series 2006 (CPOM dated August 1, 2006) and GVEC II Series 2006-A (CPOM dated October 10, 2006) offerings, including the reports referenced in the table attached as Exhibit 22.

86.    In addition, Plaintiff Taichung received NAV reports in connection with its investments in the GVECR II Series 2008 H-6 and J offerings (CPOMs dated June 21 and August 4, 2008, respectively), including the reports referenced in the table attached as Exhibit 23.

### 2.    The Net Asset Value Reports Contained Material Misrepresentations.

87.    The NAV reports were false and overstated the value of SinoPac and Taichung's investments. (*See* ¶¶ 91–105.)  Had the NAV reports been accurate, SinoPac and Taichung would have discovered the depreciated value of their investments, would have taken action to protect their interests (including discontinuing their relationship with PEM Group), and would not have invested any additional money in PEM Group's offerings.

88.     The NAV reports—although on HSBC letterhead, and routinely signed by HSBC officials—were prepared internally at PEM Group.  They were then sent to HSBC officials, like Mr. Kercado, who would put them on HSBC letterhead and sign them.  On other occasions, they were put on HSBC letterhead by PEM Group employees using HSBC letterhead provided to PEM Group by HSBC.  HSBC did nothing to verify the accuracy of these NAV reports, and instead simply "rubber-stamped" them.

89.     The NAV reports were false and misleading.  Each report represented that the investor's share in the applicable offering remained roughly equal to its principal investment.  In other words, the reports represented that the net value of the assets held in each tranche remained, at the very least, relatively constant.  In reality, by the time the NAV reports were issued, the assets held in the applicable tranches had depreciated substantially, because PEM Group was misusing the investors' funds.  (*See* ¶¶ 91–105.)  In addition, instead of complying with applicable CPOMs, PEM Group had used investor funds to make high-risk and undisclosed investments including, for example, using investor funds to acquire hundreds of acres of undeveloped land in Costa Rica, as well as a stake in a Chinese coal mine.  (*See id.*)  Finally, PEM Group executives had diverted investor funds for their personal use, as well as to pay for the company's lavish operating expenses—which included the acquisition of multiple jet aircraft, and a three day Disney cruise attended by all PEM Group employees.  (*See id.*)  Thus, contrary to the representations made in the NAV reports, the net value of the assets held in each tranche, and the value of each investor's share in that tranche, did not remain constant but had in fact plummeted.

90.     HSBC knew the NAV reports were false and misleading because, as cash custodian for the various offerings, it executed the wire transfers to noncustodial accounts, and accounts in the names of PEM Group affiliates, that PEM Group used to divert and misappropriate funds.  Further, HSBC made no effort to value the assets held in each tranche before issuing reports attesting to their NAV.  Indeed, HSBC never attempted to identify or locate the relevant assets purportedly held in each tranche.

26

### 3.   Fraudulent Circumstances Surrounding Net Asset Value Reports Sent To Plaintiff SinoPac.

91.   In August and October 2006, SinoPac invested a total of approximately $87 million in two offerings by a PEM Group SPV called GVEC II.  The offerings were called GVEC Series 2006 (CPOM dated August 1, 2006) and GVEC Debentures Series 2006-A (CPOM dated October 10, 2006).  (*See* Exhibit 7.)

92.   GVEC II purportedly acquired assets by entering into a participation agreement with GVECR IV.  GVEC II investors were told their investment would be used primarily to purchase interests in infrastructure assets and time-share real estate properties.

93.   HSBC executed various wire transfers that transferred the assets held in connection with the GVECR IV offerings to noncustodial accounts or to accounts in the names of entities affiliated with PEM Group.  These funds were paid as "loans" to PEM Group and were never repaid. For example:

a.   Approximately $3.2 million from the funds held in connection with the GVECR IV 2006 A offering:  about $2 million around October 10, 2006 to pay for operating expenses associated with PEM Group's sales office in Taipei; about $1 million around January 1, 2008 as a retainer to the law firm Fulbright & Jaworski LLP, to perform services unrelated to GVECR IV; and about $200,000 around January 11, 2008 to enable PEM Group to pay operating expenses, including company credit card bills and payroll costs.

b.   Approximately $5.3 million from the funds held in connection with the GVECR IV 2006 C offering:  about $1 million around January 23, 2007 to pay for operating expenses associated with PEM Group's office in Shanghai; about $1.5 million around November 26, 2007 to pay for, among other things, a trip by PEM Group personnel to Dubai; about $1.5 million around December 14, 2007 to pay for, among other things, PEM Group's credit card bills and a company trip to China; about $700,000 around January 22, 2008 and January 28, 2008 to pay for PEM Group's credit card bills and

27

1    payroll costs; and about $500,000 around November 19, 2008 to pay for operating

2    expenses associated with PEM Group's offices in Taipei.

3    c.    Approximately $4 million around June 5, 2007 from the funds held in connection

4          with the GVECR IV 2006 D offering to pay various expenses associated with PEM

5          Group's office in Shanghai.

6    94.   HSBC also executed wire transfers to noncustodial accounts, or to accounts

7    controlled by PEM Group executives, that were paid to Mr. Pang and other executives as unsecured

8    and interest-free "loans" that were never repaid.  For example:

9    a.    Approximately $2.5 million from the funds held in connection with the GVECR IV

10         Notes A offering:  about $1 million to Mr. Pang around April 22, 2008; and $1.5

11         million to Nevada Capital Development Partners—an entity controlled by Mr.

12         Pang—around April 23, 2008.

13   b.    Approximately $20 million from the funds held in connection with the GVECR IV

14         2006 D offering:  about $18 million around June 2007 to InterTravel and Services,

15         Inc.—an entity controlled by Mr. Pang—that was later used to purchase a Gulfstream

16         G4 aircraft; and about $2 million around January 2008 to LSPC, Inc., another entity

17         controlled by Mr. Pang.

18   95.   The CPOMs for the GVEC II offerings represented that investor funds would be used

19   to acquire infrastructure and time-share assets and receivables.  But HSBC executed various wire

20   transfers to noncustodial accounts, or accounts in the names of PEM Group affiliates, that were used

21   by PEM Group to make high-risk and undisclosed investments.  For example:

22   a.    Approximately $41 million from the funds held in connection with the GVECR IV

23         Notes A offering around September 7, 2007 to acquire shares in a Chinese company

24         involved in acquiring, exploring and developing mining properties in China with a

25         strong focus in coal, including five coal mines.

26   b.    Approximately $40 million from the funds held in connection with the GVECR IV

27         2006 C offering:  about $2.1 million around March 8, 2007 loaned to an entity, and

28         secured by a 2,700 sq. ft. mixed commercial and residential lot in San Clemente,

1    California; about $7,430,000 around April 20, 2007 loaned to an entity to fund the

2    design of a luxury ship with 200 private residences and 265 suits for cruise

3    passengers; about $19,109,000 around May 15, 2007 to an entity to acquire parcels of

4    land for hotel development; and $11,800,000 around August 22, 2007 and July 8,

5    2008 loaned to a company that distributes building materials and tools and provides

6    installation services to businesses and government.

7       c.    Approximately $24 million from the funds held in connection with the GVECR IV

8    2006 D offering:  about $1.2 million around January 15, 2007 that was later loaned

9    through a PEM Group affiliate to an individual, secured by two 2,500 sq. ft. industrial

10   buildings located in Santa Ana, California; about $2.7 million around January 29,

11   2007 that was later loaned through a PEM Group affiliate to an entity, secured by

12   95.7 acres of land in Lake Elsinore, California; about $305,000 around April 23, 2007

13   loaned to an individual and secured by a single-family, 2,800 sq. ft. residence in

14   Riverside, California; about $6,500,000 around August 14, 2007 that was later loaned

15   through a PEM Group affiliate to an entity, and secured by 160 acres of land located

16   in Nye County, Nevada; and about $13,346,000 around November 30, 2007 loaned to

17   a public company that designs, manufactures and markets electronic devices and

18   communications equipment for aerospace defense, industrial and communications

19   applications.

20      96.    HSBC also executed the wire transfers by which PEM Group caused GVECR IV to

21   purchase underperforming life settlement investments from GVEC at a premium to cost.  These

22   transactions are described *supra* at ¶¶ 78–80.

23      97.    HSBC knew, therefore, that it had executed wire transfers of approximately $140

24   million to noncustodial accounts, or accounts controlled by PEM Group affiliates, which were

25   ultimately used to acquire high-risk and undisclosed investments, and to give unsecured and interest-

26   free loans to PEM Group, Mr. Pang and others that were never repaid.  In addition, HSBC knew that

27   underperforming life settlement investments were being sold by the earlier GVEC tranches to later

28   GVECR IV tranches at a premium to cost.  All of these transactions were unauthorized and

undisclosed.  In addition, HSBC did not attempt to value any of the assets held by GVEC II before issuing reports attesting to their NAV.

98.     Yet the NAV reports for the GVEC II offerings sent to SinoPac represented that the value of SinoPac's investment remained roughly equal to its principal investment.   Had the NAV reports been accurate, SinoPac would have discovered the depreciated value of its investment and would have taken action to protect its interests, including discontinuing its relationship with PEM Group.

### 4.     Fraudulent Circumstances Surrounding The Net Asset Value Reports Sent To Plaintiff Taichung.

99.     As described in Exhibit 7, Plaintiff Taichung invested approximately $28 million in two offerings by GVECR II.

100.   HSBC executed various wire transfers of funds raised in connection with GVECR II offerings to noncustodial accounts, or accounts in the names of PEM Group affiliates, that were paid to PEM Group as "loans" to pay operating expenses.  The loans were not repaid.  For example, HSBC transferred $18 million of funds held in connection with the GVECR II Series 2007 C offering (in which Plaintiffs Hua Nan Commercial Bank, Cosmos, and EnTie invested approximately $115,840,000) to PEM Group or other noncustodial accounts, and this money was used to pay for PEM Group's expenses including:  about $11 million around October 15, 2007 to Inter Travel and Services, Inc.—an entity controlled by PEM Group and Mr. Pang—to fund the purchase of Lear Jet aircraft for PEM Group; about $3 million around July 28, 2008, and another $1.5 million around November 26, 2008, to PEM Group to pay for PEM Group's payroll expenses, a three day Christmas party aboard a Disney cruise ship, and other monthly expenses.

101.   HSBC also executed various wire transfers that were used to transfer funds held in connection with the GVECR II offerings to PEM Group executives for "commissions" that they never actually earned.  These "commissions," which were 4% of the face value of the underlying policy, were supposed to be paid to Mr. Pang and PEM Group after they had acquired the pertinent life insurance contracts.  Starting in late 2007, Mr. Pang directed the payment of "commissions" on life insurance policies that PEM Group had not acquired or purchased.  The money to pay these so-

30

1   called commissions was "borrowed" from several of the GVECR II offerings, including the GVECR

2   II 2007 D and E offerings and the GVECR II 2008 A, B, C, G, H and I offerings.  As of May 1,

3   2009, PEM Group executives received $13 million in unearned dividends.  Upon information and

4   belief, HSBC executed the wire transfers that moved this money from GVECR II accounts to

5   noncustodial accounts or accounts controlled by PEM Group executives.

6        102.    The CPOMs for the various GVECR II tranches represented that investor funds

7   would be used primarily to acquire life settlement investments.  But HSBC executed various wire

8   transfers of funds held in connection with the GVECR II offerings to noncustodial accounts, or

9   accounts in the names of PEM Group affiliates, that PEM Group used to make high-risk and

10  undisclosed investments.  For example:

11       a.      Approximately $14 million from the funds held in connection with the GVECR II

12               Series 2007 C offering:  about $10 million around December 14, 2007 to invest in

13               property on which a restaurant and boat slip are located in Newport Beach,

14               California; and about $4 million around January 3, 2008 to a PEM Group affiliate to

15               an individual, and secured by a beach front single family residence in Laguna Beach,

16               California.

17       b.      Approximately $14.5 million from the funds held in connection with the GVECR II

18               Series 2007 E offering:  about $2.3 million around September 26, 2008 to invest in a

19               partnership interest in a fund that invested in a public bank holding company that

20               provides financial products and services through offices in California and Arizona;

21               about $5 million around August 12, 2008 to a PEM Group affiliate later loaned to an

22               investment in Taiwan that engages in the manufacture and sale of fiberglass yarns;

23               about $7.2 million around February 4, 2008 to a public company that was a specialty

24               retailer of footwear and accessories for young women.

25       c.      Approximately $15.6 million from the funds held in connection with the GVECR II

26               Series 2008 A offering:  about $11,350,000 around March 11, 2008 loaned through to

27               a PEM Group affiliate and secured by a second Deed of Trust on a 16 story

28               commercial and office building at 351 California Street in San Francisco, California;

31

and about $4,353,000 around August 29, 2008 loaned through a PEM Group affiliate to a mezzanine lender ultimately secured by unsold interests in retail commercial buildings.

d. Approximately $6 million from the funds held in connection with the GVECR II Series 2008 B offering: about $1,800,000 around April 29, 2008 loaned through a PEM Group affiliate to an entity and secured by 11.6 acres of land located in Riverside, California; and about $4,200,000 around May 22, 2008 loaned through a PEM Group affiliate to an entity and secured by 66 acres of undeveloped land located in Redlands, California.

e. Approximately $35 million from funds held in connection with the GVECR II Series 2007 B and E offerings, and the GVECR II Series 2008 B and I offerings, to a PEM Group affiliate to purchase the senior Deed of Trust on a 16 story commercial and office building at 351 California Street in San Francisco, California.

f. Approximately $500,000 from the funds held in connection with the GVECR II Series 2007 D offering loaned around April 24, 2008 to a private technology company.

g. Approximately $17,711,000 from the funds held in connection with the GVECR II Series 2007 C and E offerings, and the GVECR II Series 2008 B, C and E offerings, loaned on May 21, August 8, September 16, October 10, and October 21, 2008 to various development companies and PEM Group affiliates that invested in Chinese investments, including equity investments in a solar company and debt instruments in an iron ore mining company.

h. Approximately $8,713,000 from the funds held in connection with the GVECR II Series 2007 C and D offerings on August 6 and October 7, 2008 to acquire undeveloped land in Costa Rica.

103. HSBC also knew that the life settlement investments GVECR II did acquire were underperforming because the market for life settlement investments was depreciated at the time, and HSBC undertook no efforts to value the investments. HSBC also executed wire transfers by which

32

1    underperforming life settlement investments held in earlier offerings were sold at premium to cost to

2    later offerings in order to pay investors in earlier offerings with the funds raised from later investors.

3    These transactions are described *supra* at ¶¶ 78–80.

4        104.    HSBC knew, therefore, that it had executed wire transfers of approximately $130

5    million raised in connection with the GVECR II offering to various noncustodial accounts, and

6    accounts controlled by PEM Group affiliates, which funds were used to give "loans" to PEM Group

7    and its executives and to acquire high-risk and undisclosed investments. All of these transactions

8    were unauthorized and undisclosed. And they impacted the value of assets held by GVECR II. In

9    addition, HSBC did not attempt to value any of the assets held by GVECR II before issuing reports

10   attesting to their NAV. And it knew that the life settlement investments GVECR II did acquire were

11   underperforming, or was recklessly indifferent as to whether those assets were underperforming.

12       105.    Yet the NAV reports for the GVECR II offerings sent to Plaintiff Taichung

13   represented that the value of Taichung's investment remained roughly equal to its principal

14   investment. Had the NAV reports been accurate, Taichung would have discovered the depreciated

15   value of its investment and would have taken action to protect their interests, including discontinuing

16   their relationship with PEM Group.

17   I.    **HSBC Gives Additional Substantial Assistance To PEM Group In Its Fund-Raising**

18         **Efforts.**

19       106.    Throughout PEM Group's existence, HSBC gave PEM Group substantial help in

20   raising money from investors, including Plaintiffs. The "To Whom It May Concern" letter,

21   discussed *supra* at ¶¶ 68–80, is one example. The letter that assured Hua Nan that HSBC was

22   recognizing and reviewing CPOMs for PEM Group's offerings (*see* ¶¶ 60–67), as well as the letter

23   PEM Group used to create the appearance of investment assurance (*see* ¶¶ 47–51), are other

24   examples. But there were additional, specific, instances in which HSBC knowingly helped lure in

25   additional investors for PEM Group—investors whose cash HSBC would ultimately hold as a

26   custodian.

27       107.    For example, in connection with an offering in 2006, Mr. Bufinsky, attaching a

28   CPOM for the GVECR IV Notes A tranche, e-mailed Mr. Radich, telling him: "Bob can you please

33

1  print this Offering memorandum out and have it at our meeting, its our latest Offering with the

2  Investor who is coming in tomorrow and I want to show them you keep copies of POM's on file." A

3  copy of this e-mail is attached as Exhibit 24.

4       108.   On May 9, 2007, as another example, in connection with Hua Nan's anticipated

5  investment in the GVECR II 2007 A tranche, Mr. Bufinsky e-mailed Mr. Radich—the signatory on

6  the "To Whom It May Concern" letter—and stated: "Hey bob; Hua Nan is being a bit of a pain in

7  the fact that they would like to know HSBC is recognizing the CPOM which it is a part of as listed

8  Custodian. If they don't get some sort of confirmation from our banking relationship which is now a

9  legal requirement in Taiwan, they may not be able to move on investment which is $200mm in

10  total." (*See* ¶¶ 60–67; *see also* Exhibit 14.)

11       109.   Later that month, on May 25, 2007, Mr. Bufinsky e-mailed Mr. Radich again and

12  asked: "Bob can you photocopy a copy of your liscense [sic] and hsbc I'd [sic], to bring to

13  tomorrows meeting with hua nan. This is typical of the asian clients who want to verify that a warm

14  body exists in HSBC! Remember when they would take pics of us under the hsbc signage!" A copy

15  of this e-mail is attached as Exhibit 25.

16  **J.**    **HSBC's Motivation For Developing Its Symbiotic Special Relationship With PEM**

17         **Group:  Money.**

18       110.   HSBC continued to lie on PEM Group's behalf, and offered PEM Group its

19  substantial assistance, because HSBC directly benefitted from PEM Group's fraudulent actions.

20       111.   For one thing, HSBC earned $1.8 million in its capacity as custodian, and was able to

21  earn these fees by agreeing to make transfers from PEM Group's custodial accounts to non-custodial

22  accounts (including accounts controlled by PEM Group or its executives) (*see, e.g.,* ¶¶ 91–105), and

23  by helping PEM Group solicit additional investors to increase the amount of funds under

24  management. (*See, e.g.,* ¶¶ 47–51, 60–80.)

25       112.   HSBC also benefitted in other ways on account of its special relationship with PEM

26  Group. PEM Group and Mr. Bufinsky, for example, routinely referred business to HSBC and Mr.

27  Radich. Mr. Bufinsky "returning the favour" by agreeing to "steer a little money" to Mr. Radich's

28  business acquaintance, after Mr. Radich and HSBC "helped [Mr. Bufinsky] bigtime" by providing

1   PEM Group with a letter it used to solicit additional investors, is one example of how HSBC

2   benefitted from its relationship with PEM Group. (*See* ¶ 67; *see also* Exhibit 19.) As another

3   example, on September 12, 2008, Mr. Bufinsky steered another business deal to HSBC, informing

4   · Mr. Radich that "FYI, your going to get a big escrow bro, $120m your way. Im going to make sure

5   of it." Mr. Radich replied, "Awesome." A copy of this e-mail is attached as Exhibit 26.

6       113.   As an additional example, on May 14, 2008, HSBC's Mr. Radich e-mailed Mr.

7   Bufinsky seeking new business for HSBC, saying: "Just wondering if you had anything positive re:

8   a prospective pipeline I can share[.] Am under alot of pressure, guy any good news would help." In

9   response, Mr. Bufinsky wrote, "Yes we do, I have GVECR II Series 2008 for $30mm by end of the

10  month. I also want to move forward with Scott Kerbel [another HSBC employee] and doing an

11  NTD Currency swap for $30-50MM issuing NTD bonds via Euroclear. This should bring in a good

12  amount of new funding for us." A copy of this e-mail is attached as Exhibit 27.

13      114.   As these examples demonstrate, through Mr. Radich and others, HSBC believed it

14  had much to gain from its association with PEM Group—including but by no means limited to

15  custodial fees—and was highly motivated to participate directly in the PEM Group scam.

16  **K.    Government Findings Of HSBC's Failures That Led To Illegal Activity.**

17      115.   The United States government has already found a lack of proper institutional

18  controls at HSBC that led to illegal activity. While these public findings were not explicitly

19  connected to HSBC's relationship with PEM Group they, at a minimum, demonstrate a corporate

20  culture where looking the other way was how HSBC did business. HSBC's lack of compliance was

21  an attractive environment for fraudsters to create and perpetuate their schemes, and was an apparent

22  magnet for criminals who knew that HSBC would look the other way, if not lend a helping hand like

23  HSBC did here.

24      116.   On October 7, 2010, the United States Department of the Treasury, Office of the

25  Comptroller of the Currency, issued a consent order (*available at*

26  http://www.occ.treas.gov/ftp/release/2010-121a.pdf) requiring HSBC to take "comprehensive

27  corrective actions" because its "compliance program and its implementation are ineffective," and

28  because HSBC had "not appropriately designated customers as 'high-risk[.]'" In particular, the

1    Comptroller found that HSBC had "failed to adopt and implement" an adequate compliance

2    program.  Among other things, the Comptroller found that HSBC had "inadequate" monitoring

3    procedures, "inadequate" staffing in its compliance departments, and had been "ineffective" in

4    implementing "internal controls for customer due diligence, procedures for monitoring suspicious

5    activity, and independent testing."  The Comptroller ordered HSBC to develop and implement a

6    plan, subject to oversight by the Comptroller, to address these issues and to address concerns raised

7    by "product lines, departments and branches in which suspicious activity has occurred" as well as

8    "high risk accounts by line of business and type of business."

9       117.   The same day, the Board of Governors of the United States Federal System issued a

10   similar cease and desist consent order (*available at*

11   http://www.federalreserve.gov/newsevents/press/enforcement/enf20101007c1.pdf) to HSBC's

12   corporate parent, HSBC North America Holdings, Inc., requiring it to take corrective action to,

13   among other things, improve its compliance risk-management program—and specifically "measures

14   to hold management accountable for the timely completion of compliance related projects"—due to

15   "identified deficiencies."

16      118.   As these cease and desist consent orders show, HSBC was a ripe breeding ground for

17   fraud.  HSBC's lax rules and low standards were an apparent boon to illegal activities of all kinds.

18   And while these orders are a telling sign of HSBC's flawed internal controls across the board,

19   HSBC, as described at length *supra*, did more for PEM Group than just fail to notice there was

20   illegal activity occurring—it was an active and knowing participant in the scam.

21   **L.    D&K, Through Its Principals Mr. Daily And Mr. Knudson, Approves Transactions It**

22         **Knows Violate Representations Made In Offering Memoranda And That Result In The**

23         **Loss Of Investor Funds.**

24      119.   In addition to a custodian, the CPOMs for each of PEM Group's offerings also

25   provided that an entity would serve as trustee of investor funds and assets acquired with those funds.

26   Beginning with the GVEC II Series 2006 A offering (CPOM dated October 10, 2006), and

27   continuing with each offering thereafter, D&K served as Trustee.  Indeed, the CPOM for the GVEC

28

36

II Series 2006 A offering, and the CPOMs for each offering thereafter, explicitly named D&K as the Trustee.

120.   PEM Group chose to appoint D&K as trustee because Mr. Knudson was a personal acquaintance of Mr. Pang. Mr. Pang, an avid gambler, had met Mr. Knudson while gambling.

121.   As Trustee, D&K was responsible for, among other things, assisting in the acquisition of assets, depositing investor funds in specified accounts, and making payments to HSBC (as cash custodian) at PEM Group's direction. D&K held investor funds, and assets acquired with those funds, in trust for the ultimate benefit of investors and, as such, owed the investors certain duties. The Trustee Agreement for the GVECR II Series 2006-A offering (attached as Exhibit 28), for example, provided that:

> The Trustee shall hold in trust the funds and property as described in this Agreement[.] . . . The beneficiary of the Trust . . . shall be [GVEC II] *on behalf of the holders of the Debentures* in accordance with the terms and conditions of the Memorandum. . . The Trustee shall *strictly observe and perform its duties and pay funds, distribute proceeds or invest assets in accordance with the terms and conditions as provided herein solely for the benefit of the Beneficiary.*

(emphasis added).

122.   The D&K Defendants breached the duties owed to investors by, among other things, approving transfers that were unauthorized, undisclosed, outside the ordinary course of business, and harmful to investors' interests. In exchange for making these improper transfers, D&K earned substantial fees.

123.   For example, on November 11, 2008, Joseph Fighera (a D&K associate) e-mailed Mr. Kercado at HSBC, copying Mr. Daily and Mr. Knudson, instructing Mr. Kercado to transfer $2.5 million from the investor funds held in connection with the GVECR II 2008 A and G offerings as a "loan" to LSPC, Inc., an entity controlled by Mr. Pang. Mr. Kercado responded, informing Mr. Fighera, Mr. Daily and Mr. Knudson, and officials at PEM Group, including the CFO, that the transfer would be executed the following day. The CFO forwarded Mr. Kercado's message to Mr. Pang, saying "FYI, HSBC says wire going out tomorrow!" Mr. Pang responded, "Thanks." (*See* Exhibit 29.) This use of investor funds was unauthorized and not disclosed in the CPOMs for either

37

1    the GVECR II 2008 A-1 through A-5 offerings, in which Plaintiff Hua Nan Investment Trust

2    invested a total of approximately $30,616,225, or the GVECR II 2008 G offering, in which Plaintiffs

3    Taichung and EnTie invested over $18,600,000. (*See* Exhibit 7.)

4          124.    Indeed, the D&K Defendants routinely approved transfers that were improper and

5    undisclosed to investors, and which harmed investors' interests.

6          125.    The D&K Defendants, for example, approved a transfer on December 17, 2007, from

7    the investor funds held in connection with the GVECR II 2007-C offering to Nevada Capital

8    Holdings Partners Property Investment ("Nevada Capital Holdings") in the amount of $10,000,000.

9    Nevada Capital Holdings was an entity controlled by Mr. Pang. The D&K Defendants knew Nevada

10    Capital Holdings was controlled by Mr. Pang. Indeed, Mr. Knudson was personally involved in

11    incorporating an affiliate of Nevada Capital Holdings, called Nevada Capital Development Partners,

12    as an LLC in Nevada on Mr. Pang's behalf. The $10,000,000 was used by PEM Group to invest in

13    property on which a restaurant and boat slip is located in Newport Beach, California. This use was

14    unauthorized and not disclosed in the CPOM for the GVECR II 2007 C offering. Plaintiffs Hua Nan

15    Commercial Bank, Cosmos and EnTie invested approximately $115,840,000 in the GVECR II 2007

16    C offering. (*See* Exhibit 7.)

17          126.    The D&K Defendants also approved a transfer on February 4, 2008 from the investor

18    funds held in connection with the GVECR II 2007 E offering to Term Loan Bakers Footwear Group

19    Inc. in the amount of $7,200,000, as a loan to develop Term Loan's business as a specialty retailer of

20    footwear and accessories for young women. This use was unauthorized and not disclosed in the

21    CPOM for the GVECR II 2007 E offering. Plaintiffs Hua Nan Commercial Bank, Cosmos and

22    EnTie invested approximately $56 million in the GVECR II 2007 E offering. (*See* Exhibit 7.)

23          127.    The D&K Defendants approved more transfers on August 6, 2008 and October 7,

24    2008 from the investor funds held in connection with the GVECR II 2007 C and D offerings to

25    Dominical Holdings in the amount of approximately $9,000,000, used to acquire undeveloped land

26    in Costa Rica. This use was unauthorized and not disclosed in the CPOMs for either the GVECR II

27    2007 C or D offerings. Plaintiffs Hua Nan Commercial Bank, Cosmos and EnTie invested

28    approximately $131,390,000 in the GVECR II 2007-C and D offerings. (*See* Exhibit 7.)

128.   As a result of the D&K Defendants' approval and participation in PEM Group's fraud, Plaintiffs have suffered over $500 million in damages.  The D&K Defendants knew or should have known that, by repeatedly approving transfers of investor funds to entities controlled by PEM Group and PEM Group executives, Plaintiffs would suffer these losses.  But the D&K Defendants approved the transfers anyway, in part because they wanted to continue serving as Trustee, which earned them substantial fees.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR FRAUD
### AGAINST DEFENDANT HSBC
### BY ALL PLAINTIFFS

129.   Paragraphs 1 through 128 are incorporated by reference.

130.   HSBC made material representations of fact, including those contained in its "To Whom It May Concern" reference letter, as well as in the HSBC NAV reports.  (*See* ¶¶ 73–88.)

131.   HSBC's representations were false and misleading, including as it relates to the length of time HSBC had served as custodian, whether the offerings had performed in conformance with the CPOMs, and as to the accuracy of the NAV reports.  (*See* ¶¶ 74–105.)

132.   HSBC knew its representations were false and misleading, or recklessly disregarded whether its representations were truthful.  (*See id.*)

133.   HSBC made its representations intending to induce Plaintiffs to act in reliance upon them.  (*See* ¶¶ 71–88, 110–14.)

134.   Plaintiffs reasonably relied on HSBC's representations, and as a result, invested in various PEM Group offerings as described in Exhibit 7.  The following principal amounts are still outstanding and due Plaintiffs in connection with their investments:  $191,148,965 to Hua Nan Commercial Bank; $48,263,804 to Hua Nan Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung; $49,997,787 to EnTie; and $44,904,682 to Cosmos.

135.   Plaintiffs are entitled to recover the amount of their lost principal, plus the promised interest rate from the date of their investment.  Plaintiffs also are entitled to recover prejudgment interest on their lost principal at the maximum rate allowable under the law.

136.   HSBC's actions were malicious, fraudulent, oppressive, and intended to injure the Plaintiffs, and thus plaintiffs are entitled to recover punitive damages pursuant to California Civil Code § 3294.

### SECOND CAUSE OF ACTION
### FOR NEGLIGENT MISREPRESENTATION
### AGAINST DEFENDANT HSBC
### BY ALL PLAINTIFFS

137.   Paragraphs 1 through 136 are incorporated by reference.

138.   HSBC made material representations of fact, including those contained in its "To Whom It May Concern" reference letter, as well as in the HSBC NAV reports. (*See* ¶¶ 73–88.)

139.   HSBC's representations were false and misleading, including as it relates to the length of time HSBC had served as custodian, whether the offerings had performed in conformance with the CPOMs, and as to the accuracy of the NAV reports. (*See* ¶¶ 74–105.)

140.   HSBC made these representations without a reasonable belief that the representations were truthful. (*See id.*)

141.   HSBC made its representations intending to induce Plaintiffs to act in reliance upon them. (*See* ¶¶ 71– 88, 110–114.)

142.   Plaintiffs reasonably relied on HSBC's representations, and as a result, invested in various PEM Group offerings as described in Exhibit 7.  The following principal amounts are still outstanding and due Plaintiffs in connection with their investments:  $191,148,965 to Hua Nan Commercial Bank; $48,263,804 to Hua Nan Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung; $49,997,787 to EnTie; and $44,904,682 to Cosmos.

143.   Plaintiffs are entitled to recover the amount of their lost principal, plus the promised interest rate from the date of their investment.  Plaintiffs are also entitled to recover prejudgment interest at the maximum rate allowable under the law.

### THIRD CAUSE OF ACTION
### FOR AIDING AND ABETTING FRAUD
### AGAINST ALL DEFENDANTS
### BY ALL PLAINTIFFS

144.   Paragraphs 1 through 143 are incorporated by reference.

40

145.   PEM Group and its subsidiaries and executives, including Mr. Pang, engaged in fraud by, among other things: making material misrepresentations of fact designed to swindle investors, such as plaintiffs, out of substantial amounts of money. In reliance on PEM Group's misrepresentations, and without knowledge of PEM Group's fraud, plaintiffs invested money that they did not recover.

146.   Defendants actually knew that PEM Group was engaged in fraudulent activities. HSBC was aware of PEM Group's fraud as evidenced by its creation of a fraudulent "To Whom It May Concern" reference letter; its creation of false NAV reports; its "rubber-stamping" of fraudulently created PEM Group documents; and its participation in mischievous actions designed to fool investors about the security of their investments in PEM Group's offerings. (*See* ¶¶ 47–51, 60–105.) The D&K Defendants were actually aware of PEM Group's fraudulent activities by reason of its daily role as trustee required to administer plaintiffs' investments, and as evidenced by its execution of multiple instructions in violation of applicable CPOMs. (*See* ¶¶ 119–28.) Mr. Bufinsky was actually aware of PEM Group's fraud as demonstrated by his active role in creating false documents designed to induce plaintiffs into investing in PEM Group. (*See* ¶¶ 47–51, 60–105.)

147.   Defendants' actions substantially assisted PEM Group's fraud by, among other things, (1) actually aiding in raising funds for the fraud, (2) creating a false sense of security regarding the offering, (3) communicating with investors about the fraud, and (4) administering the fraud so as to prolong it. Without Defendants' active participation, the fraud could not have been maintained.

148.   As a proximate result of Defendants' conduct, Plaintiffs invested with PEM Group (*see* Exhibit 7) and were defrauded. The following principal amounts are still outstanding and due Plaintiffs in connection with their investments: $191,148,965 to Hua Nan Commercial Bank; $48,263,804 to Hua Nan Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung; $49,997,787 to EnTie; and $44,904,682 to Cosmos.

149.    Plaintiffs are entitled to recover the amount of their lost principal, plus the promised interest rate from the date of their investment.  Plaintiffs are also entitled to recover prejudgment interest at the maximum rate allowable under the law.

150.    Defendants' actions were malicious, fraudulent, oppressive, and intended to injure the Plaintiffs, and thus Plaintiffs are entitled to recover punitive damages pursuant to California Civil Code § 3294.

**FOURTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING BREACH**
**OF FIDUCIARY DUTY**
**AGAINST ALL DEFENDANTS**
**BY ALL PLAINTIFFS**

151.    Paragraphs 1 through 150 are incorporated by reference.

152.    PEM Group and its subsidiaries and executives, including Mr. Pang, owed fiduciary duties to Plaintiffs by reason of the promises and representations they made to Plaintiffs in the CPOMS and other documents.  PEM Group and Mr. Pang breached these fiduciary duties by, among other things, misusing and absconding with substantial amounts of Plaintiffs' invested funds.

153.    Defendants actually knew that PEM Group was engaged in fraudulent activities and activities that breached their fiduciary duties to Plaintiffs.  HSBC was aware of PEM Group's fraud as evidenced by its creation of a fraudulent "To Whom It May Concern" reference letter; its creation of false NAV reports; its "rubber-stamping" of fraudulently created PEM Group documents; and its participation in mischievous actions designed to fool investors about the security of their investments in PEM Group's offerings. (*See* ¶¶ 47–51, 60–105.)  The D&K Defendants were actually aware of PEM Group's fraudulent activities by reason of its daily role as trustee required to administer plaintiffs' investments, and as evidenced by its execution of multiple instructions in violation of applicable CPOMs. (*See* ¶¶ 119–28.)  Mr. Bufinsky was actually aware of PEM Group's fraud as demonstrated by his active role in creating false documents designed to induce plaintiffs into investing in PEM Group. (*See* ¶¶ 47–51, 60–105.)

154.    Defendants' actions substantially assisted PEM Group's fraud by, among other things, (1) actually aiding in raising funds for the fraud, (2) creating a false sense of security regarding the offering, (3) communicating with investors about the fraud, and (4) administering the

42

1    fraud so as to prolong it. Without Defendants' active participation, the fraud could not have been
2    maintained.
3          155.    As a proximate result of Defendants' conduct, Plaintiffs invested with PEM Group
4    (*see* Exhibit 7) and were defrauded. The following principal amounts are still outstanding and due
5    Plaintiffs in connection with their investments: $191,148,965 to Hua Nan Commercial Bank;
6    $48,263,804 to Hua Nan Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung;
7    $49,997,787 to EnTie; and $44,904,682 to Cosmos.
8          156.    Plaintiffs are entitled to recover the amount of their lost principal, plus the promised
9    interest rate from the date of their investment. Plaintiffs are also entitled to recover prejudgment
10   interest at the maximum rate allowable under the law.
11         157.    Defendants' actions were malicious, fraudulent, oppressive, and intended to injure the
12   Plaintiffs, and thus Plaintiffs are entitled to recover punitive damages pursuant to California Civil
13   Code § 3294.

### FIFTH CAUSE OF ACTION
### FOR CONSPIRACY TO COMMIT FRAUD AND
### BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS
### BY ALL PLAINTIFFS

17         158.    Paragraphs 1 through 157 are incorporated by reference.
18         159.    As described more fully above, PEM Group engaged in fraud and breached fiduciary
19   duties it owed to Plaintiffs. These acts were wrongful.
20         160.    Defendants entered into a conspiracy with PEM Group and its executives, including
21   Mr. Pang, to commit these wrongful acts. The agreement was explicit or may be implied from
22   Defendants' conduct including, among other things: the material misrepresentations HSBC made in
23   its "To Whom It May Concern" reference letter and in various NAV reports; the various fraudulent
24   letters Mr. Bufinsky and others at PEM Group ghost-wrote and HSBC signed; and the numerous
25   improper and undisclosed transfers that D&K approved from accounts containing investor funds to
26   noncustodial accounts, including accounts controlled by PEM Group and its executives. HSBC
27   earned over $1.8 million for serving as custodian for offerings by PEM Group. D&K also earned

1   substantial fees for serving as trustee for the offerings, and Mr. Bufinsky was paid a generous salary

2   as an employee of PEM Group.  (*See, e.g.,* ¶¶ 47–51, 68, 60–105, 119–28.)

3       161.   Plaintiffs, who invested with PEM Group in reliance on PEM Group's fraud and

4   promises, suffered substantial losses as the natural and probable consequence of Defendants'

5   conspiracy with PEM Group and Mr. Pang.

6       162.   The following principal amounts are still outstanding and due Plaintiffs in connection

7   with their investments:  $191,148,965 to Hua Nan Commercial Bank; $48,263,804 to Hua Nan

8   Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung; $49,997,787 to EnTie; and

9   $44,904,682 to Cosmos.  Plaintiffs are entitled to recover the amount of their lost principal, plus the

10  promised interest rate from the date of their investment.  Plaintiffs are also entitled to recover

11  prejudgment interest at the maximum rate allowable under the law.

12      163.   Defendants' actions were malicious, fraudulent, oppressive, and intended to injure the

13  Plaintiffs, and thus Plaintiffs are entitled to recover punitive damages pursuant to California Civil

14  Code § 3294.

15

16  **SIXTH CAUSE OF ACTION**<br>**FOR BREACH OF FIDUCIARY DUTY**<br>**AGAINST DEFENDANTS D&K, MR. DAILY AND MR. KNUDSON**<br>**BY ALL PLAINTIFFS**

17

18      164.   Paragraphs 1 through 163 are incorporated by reference.

19      165.   D&K agreed to serve as a trustee with respect to investor funds raised by various

20  investment offerings conducted by SPVs controlled by PEM Group.  As a result, the D&K

21  Defendants owed Plaintiffs, who were investors in these offerings, certain fiduciary duties—

22  including the duties of care, loyalty, and good faith—to ensure that Plaintiffs' money was invested

23  as PEM Group had represented.  (*See* ¶¶ 119–21.)

24      166.   The D&K Defendants breached their fiduciary duties by repeatedly approving

25  transactions that were not disclosed or authorized in the applicable CPOMs, and which they knew

26  harmed the interests of investors, including Plaintiffs.  For example, they approved, and HSBC

27  executed, transfers in excess of $39 million to various entities, including entities controlled by Mr.

28

44

1    Pang, that PEM Group used to divert funds and acquire interests in high-risk and undisclosed

2    investments. (*See* ¶¶ 122–27.)

3         167.    As a result of the D&K Defendants' actions, PEM Group was able to divert the funds

4    Plaintiffs invested in various offerings, resulting in substantial losses to Plaintiffs in the amounts

5    listed in Exhibit 7. (*See* ¶ 128.)  The following principal amounts are still outstanding and due

6    Plaintiffs in connection with their investments:  $191,148,965 to Hua Nan Commercial Bank;

7    $48,263,804 to Hua Nan Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung;

8    $49,997,787 to EnTie; and $44,904,682 to Cosmos.

9         168.    Plaintiffs are entitled to recover the amount of their lost principal, plus the promised

10   interest rate from the date of their investment.  Plaintiffs are also entitled to recover prejudgment

11   interest at the maximum rate allowable under the law.  The D&K Defendants' actions were

12   malicious, fraudulent, oppressive, and intended to injure the Plaintiffs, and thus Plaintiffs are entitled

13   to recover punitive damages pursuant to California Civil Code § 3294.

14

15                         **SEVENTH CAUSE OF ACTION**
                                 **FOR NEGLIGENCE**
16          **AGAINST DEFENDANTS D&K, MR. DAILY AND MR. KNUDSON**
                               **BY ALL PLAINTIFFS**

17        169.    Paragraphs 1 through 168 are incorporated by reference.

18        170.    D&K served as trustee of investor funds in connection with various investment

19   offerings in which Plaintiffs invested.  As trustee, the D&K Defendants had the duty to act

20   reasonably in the interests of Plaintiffs.  The D&K Defendants breached this duty by negligently

21   approving transfers that were unauthorized and undisclosed in the applicable CPOMs. (*See* ¶¶ 119–

22   28.)

23        171.    As a proximate result of the D&K Defendants' negligence, Plaintiffs suffered

24   damages.  The following principal amounts are still outstanding and due Plaintiffs in connection

25   with their investments:  $191,148,965 to Hua Nan Commercial Bank; $48,263,804 to Hua Nan

26   Investment Trust; $121,643,778 to SinoPac; $69,527,206 to Taichung; $49,997,787 to EnTie; and

27   $44,904,682 to Cosmos.

28

                                     45

172. Plaintiffs are entitled to recover the amount of their lost principal, plus the promised interest rate from the date of their investment. Plaintiffs are also entitled to recover prejudgment interest at the maximum rate allowable under the law.

### PRAYER FOR RELIEF

173. Plaintiffs seek compensatory damages in the following principal amount: (1) $191,148,965 to Hua Nan Commercial Bank; (2) $48,263,804 to Hua Nan Investment Trust; (3) $121,643,778 to SinoPac; (4) $69,527,206 to Taichung; (5) $49,997,787 to EnTie; and (6) $44,904,682 to Cosmos. In addition, Plaintiffs are entitled to recover the contracted-for interest from the date of their investments. The exact amount of these compensatory damages will be proven at trial.

174. Plaintiffs seek prejudgment interest on all amounts owing at the maximum rate allowable under the law.

175. On account of Defendants' malice, oppression or fraud, Plaintiffs pray for punitive damages pursuant to California Civil Code § 3294.

176. Plaintiffs also pray for attorney's fees, costs of suit, and any other order or measure of relief that the Court deems just and proper.

### JURY TRIAL DEMAND

177. Plaintiffs demand a jury trial on all claims.

DATED: October 15, 2010

Respectfully submitted,

R. Alexander Pilmer
Christopher T. Casamassima
Sasha Danna
Nien-Ping Wang
Jay Bhimani

KIRKLAND & ELLIS LLP
Attorneys for Plaintiffs

46